**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

| | |
|---|---|
| **MEAGHIN JORDAN,** *individually***;**<br>**JONATHAN JORDAN,** *individually***;**<br>**MEAGHIN AND JONATHAN JORDAN,**<br>*on behalf of their minor son, Braylon Jordan* | **PLAINTIFFS** |
| **V.** | **CAUSE NO. 3:15-CV-220-CWR-LRA** |
| **MAXFIELD & OBERTON HOLDINGS<br>LLC; CRAIG ZUCKER; JAKE<br>BRONSTEIN; ASSEMBLE LLC; GREAT<br>AMERICAN E&S INSURANCE<br>COMPANY; EVANSTON INSURANCE<br>COMPANY,** *f/k/a* **ALTERRA AMERICAN<br>INSURANCE COMPANY; INDIAN<br>HARBOR INSURANCE COMPANY** | **DEFENDANTS** |

**ORDER**

Before the Court are motions to dismiss filed by Maxfield & Oberton Holdings LLC,

Assemble LLC, Craig Zucker, and Jake Bronstein. The motions are fully briefed and ready for

adjudication.

**I.      Factual and Procedural History**

"Buckyballs" are small, extremely powerful "rare earth" magnets. They are so powerful

that if ingested, they will cut through stomach and intestine to be reunited with each other.

When he was 22 months old, Braylon Jordan swallowed eight Buckyballs. He required

several surgeries to remove them. Most of his small bowel and small intestine had to be removed

as well, and at one point Braylon was placed in an induced coma. He lived but will require

substantial medical care in the future since, among other things, he can no longer digest food.

Braylon was not alone. Dozens of children across America sustained Buckyball-related injuries. The Consumer Product Safety Commission (CPSC) eventually declared Buckyballs illegal and recalled them.

In this suit, Braylon and his parents are suing Maxfield & Oberton Holdings LLC (M&O), the company which made and sold millions of Buckyball sets from 2009 through 2012. The Jordans claim M&O is liable to them for designing a defective product and failing to warn them about Buckyballs' true risks.

The narrative gets more complicated from 2012-onward. As Buckyballs started to cause injuries, M&O took a hardline stance against regulatory scrutiny. When it saw the writing on the wall, though – never-ending personal injury and regulatory actions – it dissolved in December 2012, distributed its profits to equal owners Craig Zucker and Jake Bronstein, and left a mere $350,000 fund to pay anticipated claims.

The Jordans say that the distribution was a fraudulent transfer intended to avoid known and anticipated personal injury claims like Braylon's, since $350,000 was grossly inadequate to pay substantial medical expenses. Their complaint states that the fund now has only $100,000 to pay 380 claims. They also allege that M&O's dissolution was a sham and that the company continues to sell Buckyballs today.

Six months after dissolution, say the Jordans, Zucker created a new company called Assemble LLC to continue to sell Buckyballs. (Assemble sells them encased in Lucite, so children cannot swallow them). Assemble uses M&O's intellectual property despite a disclaimer on its website declaring its independence from M&O. Assemble's website also states that all of its profits go toward Zucker's legal defense fees in the CPSC proceeding, which concluded in

May 2014. Assemble's marketing is also similar to M&O's; for example, both take a strong anti-CPSC stance.

Alongside their products liability claims against M&O, therefore, the Jordans have sued Zucker and Bronstein for fraudulently stripping M&O of assets which should have been reserved for injured children. Similar relief is sought against Assemble. The Jordans' causes of action include civil conspiracy, Racketeer Influenced and Corrupt Organizations Act (RICO), and Uniform Fraudulent Transfer Act (UFTA) counts.

To further complicate matters, the Jordans have also named as defendants three insurance companies which allegedly colluded with M&O to dissolve the LLC. Dissolution meant the insurers could immediately deny coverage in ongoing litigation. The result of dissolution was to benefit the insurance companies, since they too could avoid paying known and expected claims like the Jordans'. The insurance companies have filed their own dispositive motions which will be addressed in a separate Order.

After substantial briefing here, as well as satellite litigation in the Chancery Court of Delaware, M&O has now been "revived" as a Delaware LLC for the limited purpose of defending this suit. It has therefore withdrawn its motion to dismiss, which had argued that a dissolved Delaware LLC could not be sued. The motions of Assemble and M&O's founders are taken up below.

## II.     Legal Standard

When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To proceed, the complaint "must contain a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 677-78

(quotation marks and citation omitted). This requires "more than an unadorned, the defendant-

unlawfully-harmed-me accusation," but the complaint need not have "detailed factual

allegations." *Id.* at 678 (quotation marks and citation omitted). The plaintiff's claims must also

be plausible on their face, which means there is "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation

omitted).

## III.   Discussion

### A.   Assemble[1]

Assemble argues that the Jordans have failed to state a claim because the company did

not and could not have physically injured their son; Braylon was injured in April 2012 and

Assemble was formed in June 2013. Assemble then denies that it is a continuation company and

that it uses M&O's intellectual property.

The argument mischaracterizes the nature of the Jordans' claims. Assemble is not being

pursued for the actual products liability injuries which predate its formation. It is being sued as

M&O's successor in carrying out the fraudulent scheme, which has assets that should have been

reserved for persons injured by M&O's product. The theory is mindful of the Mississippi

precedent which "empower[s] the judicial conscience that the debt may follow the assets and a

remedy may be had against those who cause the transfer and their transferees who take with

notice and give less than fair value." *Morris v. Macione*, 546 So. 2d 969, 971 (Miss. 1989).

That brings us to the other half of the argument: is Assemble effectively a continuation of

M&O? The motion to dismiss contends that Assemble "simply promotes a message while selling

products that are completely separate and apart and otherwise unrelated to Buckyballs." Docket

---

[1] Assemble's first motion to dismiss, Docket No. 39, was mooted by the filing of the Second Amended Complaint. Assemble refiled its motion at Docket No. 46.

No. 46, at 4. It also notes the disclaimer on its website denying any affiliation with M&O, which says, in relevant part, "Assemble is not a successor entity to [M&O]." Docket No. 41-7.

At the motion to dismiss stage, however, the Court cannot disregard the detailed allegations which strongly suggest that Assemble is M&O's successor. The two companies share a founder (Zucker), sell the same product (with the Lucite-encasement twist), use the same intellectual property, and promote the same message via similar marketing. Assemble admittedly sends its profits to M&O's cofounder's legal defense fund – a fund which was created for regulatory action against M&O and that very cofounder. That Assemble summarily denies being M&O's successor is not determinative: any fraudulent scheme carried out with any forethought would deny a relationship between predecessor and successor entities. Evidence adduced during discovery will unearth the truth.

Assemble's argument is fact-based; it does not challenge the underlying Mississippi law.[2] But the Jordans' factual allegations are sufficient, at least for purposes of a motion to dismiss, to establish Assemble as a part of the fraudulent scheme and a continuation entity which may have assets to satisfy the Jordans' claims.

The motion to dismiss is denied.[3]

## B.      Zucker and Bronstein

Zucker and Bronstein's motion contends that the Court lacks personal jurisdiction over them, mainly because they lack minimum contacts with Mississippi.[4]

---

[2] The Mississippi Supreme Court has "repeatedly disapproved of corporate asset-stripping as a debt-avoidance measure" and long "frowned upon a corporate reincarnation which, by whatever name it may be called . . . stripped the old company of all of its property, left it without the means to pay its debts, absorbed its stocks, bonds, and franchises, and took up its residence in the house of the deceased." *Phillips v. MSM, Inc*, No. 3:12-CV-175-CWR-FKB, 2015 WL 420327, at *3 (S.D. Miss. Feb. 2, 2015) (quotation marks and citation omitted); *see also Paradise Corp. v. Amerihost Dev., Inc.*, 848 So. 2d 177, 181 (Miss. 2003) ("A wealth of evidence exists to prove that Paradise is exploiting the goodwill of Paradise Pools and Spas for the attendant benefits and yet wants to avoid the liabilities.").

[3] Assemble moved for and received two extensions of time in which to file a rebuttal. No rebuttal was received.

### 1.      Substantive Law

According to the Fifth Circuit,

> federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court. The theory underlying these cases is that, because the two corporations (or the corporation and its individual alter ego) are the *same entity,* the jurisdictional contacts of one *are* the jurisdictional contacts of the other.

*Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002) (citations omitted).

The Mississippi Supreme Court defines alter ego as "'[a] corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation.'"[5] *Tanfield Eng'g Sys., Inc. v. Thornton*, 97 So. 3d 694, 702 (Miss. 2012) (quoting Black's Law Dictionary 86 (8th ed. 2007)).

Mississippi courts have not clearly articulated a standard for determining when an individual is using a corporation as an alter ego. *See Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969, 977 (Miss. 2007). As the *Thornton* case suggests, the issue is often discussed in conjunction with piercing the corporate veil, which has a different application and analysis – even if the two theories ultimately "are interchangeable in result." Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:37 (2001) (noting that the two phrases are "generally used without great specificity of meaning").

---

[4] Zucker and Bronstein initially also took issue with service of process. That issue was later resolved to the parties' mutual satisfaction. The Court grants Zucker and Bronstein's motion to amend their reasons for dismissal.

[5] The Court will assume that Mississippi's alter ego law applies to today's personal jurisdiction inquiry. *See Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) ("this complicated choice of law question is an open issue").

In *Jarrett v. Dillard*, the Mississippi Supreme Court found that an executive had used his corporation as an alter ego when he failed to observe corporate formalities, comingled corporate and personal assets, and was the decision-maker behind the corporation's actions. 167 So. 3d 1147, 1153 (Miss. 2015). *Thames & Co. v. Eicher* arrived at the same result on evidence that the executive held all the company stock, supplied its funds, convened no regular board meetings, had no board minutes, and generally "treated the corporation almost as though it did not exist." 373 So. 2d 1033, 1035 (Miss. 1979).

It is not obvious, however, that these factors are elements *required* to prove an alter ego relationship.[6] A leading treatise on Mississippi law indicates that a court should consider a variety of kinds of evidence on whether "the persons involved fail to behave as separate entities," as well as whether "uphold[ing] corporate separateness . . . would result in permitting a fraud to go forward." Jackson & Miller §§ 22:37, 22:38, 22:42. "The doctrine has an unmistakable air of equity." *Id.* § 22:38; *see also Beco, Inc. v. Am. Fid. Fire Ins. Co.*, 370 So. 2d 1343, 1345 (Miss. 1979) (looking to "evidence and inferences" to conclude that an individual and his family corporation were essentially the same "real actor" harmed by an insurance company); *Lakota Girl Scout Council, Inc. v. Havey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 638 (8th Cir. 1975) (enumerating six factors a jury "may" weigh in determining alter ego status).

### 2.    Analysis

With the substantive law now expounded, if not actually clarified, we return to our case.

It is undisputed that Assemble is subject to this Court's jurisdiction. That matters because the Jordans' allegations strongly suggest that Assemble is Zucker's alter ego. Perhaps their most compelling fact is that Zucker uses Assemble's revenues for his personal legal defense fund in

---

[6] Piercing the corporate veil may initially look more rigid because it involves a three-part test, but Mississippi case law also permits "exceptions to the three-part standard where rigidly maintaining the corporate entity would subvert the ends of justice." *Phillips*, 2015 WL 420327, at *9 (citation omitted).

the (now-concluded) regulatory proceedings. That fact – which is supported by the attachments

to the Jordans' complaint, *see* Docket No. 41-6, at 2 – plausibly suggests a comingling of

corporate with personal assets, as well as a unity of interest between Assemble and Zucker, such

that one is the alter ego of the other.

Given the entire complaint's allegations of fraud and inequitable conduct, moreover, the

Court is concerned that permitting the Jordans to proceed against M&O and Assemble without

Zucker could sanction a fraud.[7] At least at the motion to dismiss stage, then, the Court will

accept Assemble's jurisdictional contacts as Zucker's and deny the motion to dismiss as to him.

That leaves Bronstein. The Jordans contend that this Court has personal jurisdiction over

Bronstein because he used M&O as his alter ego. In response, Bronstein presses that he has not

committed a tort in Mississippi and does not have minimum contacts with Mississippi.

The standard for personal jurisdictional motions is well-established.

> Procedurally, the party invoking the jurisdiction of a federal court bears the
> burden of establishing minimum contacts justifying the court's jurisdiction over a
> nonresident defendant. When a court rules on a motion to dismiss for lack of
> personal jurisdiction without holding an evidentiary hearing, as in the present
> case, however, the nonmoving party need only make a prima facie showing, and
> the court must accept as true the nonmover's allegations and resolve all factual
> disputes in its favor.

*Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 625 (5th Cir. 1999). In an alter ego case, though,

"this court is confronted with the [quandary] of a liberal construction of the plaintiff's pleadings

in a motion to dismiss, and the strict requirement of unusual circumstances to pierce the

corporate veil." *N. Am. Plastics, Inc. v. Inland Shoe Mfg. Co.*, 592 F. Supp. 875, 879 (N.D. Miss.

1984).

---

[7] Of some concern are the allegations describing the close temporal proximity between M&O's decision to dissolve
and its decision to admit in a pending Declaratory Action that it was not entitled to insurance coverage it had
purchased.

Here, the Court is asked to take as true allegations that Bronstein used M&O as his alter ego to defraud the Jordans by dissolving M&O, allowing insurance policies to be cancelled, leaving an inadequate claim fund, and so on. The problem is that the complaint lacks allegations describing *with particularity* how Bronstein used M&O as an alter ego or otherwise participated in the fraudulent scheme.

Zucker was the CEO, "General Manager," public face of the company, director of M&O's safety compliance program, and target of the CPSC regulatory action. Bronstein was a 50% owner, yes, but the allegations that he participated in and authorized Zucker's acts are made merely on "information and belief." *E.g.*, Docket No. 41, at 27. We do not know what Bronstein did to perpetrate a fraud beyond merely being a half-owner of the company. That is not enough to state claim of fraud – at least to warrant a preliminary finding of alter ego status.

The complaint also does not explain how Bronstein's actions could satisfy any of the other elements of the alter ego analysis. In contrast to the more specific allegations about Zucker's conduct, there are no allegations indicating *how* Bronstein failed to observe corporate formalities, comingled corporate and personal assets, or was the decision-maker behind the company's actions, among other possibilities. As a result, M&O's contacts cannot be imputed to him. *Accord Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 585 (5th Cir. 2010) (finding no personal jurisdiction as to one defendant, where plaintiff had "treat[ed] the contacts of one entity as applicable to all"); *Inland Shoe*, 592 F. Supp. at 879.

The Jordans' other arguments for personal jurisdiction over Bronstein are unpersuasive. The UFTA, corporate officer liability, and civil conspiracy counts require the Jordans to satisfy Mississippi's long-arm statute and the due process clause. Assuming they could overcome the first hurdle, they cannot clear the second, since (in the absence of an alter ego relationship)

Bronstein lacks minimum contacts with Mississippi. *See Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 320 (1945).

The civil RICO count fails for a different reason. It is true that under that statute, a plaintiff may secure "personal jurisdiction over defendants who would not otherwise be within the court's jurisdictional reach" if it is shown that "the 'ends of justice' so require." *Dale v. Frankel*, 131 F. Supp. 2d 852, 861 (S.D. Miss. 2001) (citation omitted). "This section [18 U.S.C. § 1965(b)] was intended to enable a plaintiff to bring before a single court for trial all members of a nationwide RICO conspiracy." *Anchor Glass Container Corp. v. Stand Energy Corp.*, 711 F. Supp. 325, 330 (S.D. Miss. 1989) (citations omitted).

In this district, however, the ends of justice do not support jurisdiction over a non-resident when there is an alternative forum in which the RICO suit could be heard against all defendants. *See id.* at 331; *Farmer v. D & O Contractors, Inc.*, 40 F. Supp. 3d 793, 799 (N.D. Miss. 2014). *But see Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 781 (N.D. Tex. 2008) ("Insulating such a criminal enterprise from liability, when, for instance, the victim is unable to finance long-distance litigation, is not consistent with RICO's purpose."). And here, Bronstein states (and the other defendants apparently agree) that they are all subject to personal jurisdiction in New York and Delaware.

"Neither justice nor judicial economy would be served by forcing the plaintiffs to fracture their claims across multiple forums to reach the various defendants." *David v. Signal Int'l, LLC*, 588 F. Supp. 2d 718, 724 (E.D. La. 2008). But justice and judicial economy are also disserved by forcing the parties to conduct discovery and litigate in this district, only to have a close question of personal jurisdiction vacated on appeal.

The parties are directed to discuss how they would like to proceed. Bronstein may withdraw his objection to personal jurisdiction should he prefer to stand with the other defendants, or he may have the claims against him severed and transferred to an appropriate federal court in New York or Delaware. *See Anchor Glass*, 711 F. Supp. at 331; *Farmer*, 40 F. Supp. 3d at 801. The parties shall report back in 30 days.

## IV.    Conclusion

For the reasons stated above, this case shall proceed in this Court against M&O, Assemble, and Zucker.

**SO ORDERED**, this the 22nd day of March, 2016.

s/ Carlton W. Reeves
UNITED STATES DISTRICT JUDGE