**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**MEAGHIN JORDAN, INDIVIDUALLY;**
**JONATHAN JORDAN, INDIVIDUALLY, AND**
**MEAGHIN AND JONATHAN JORDAN**
**ON BEHALF OF THEIR MINOR SON,**
**BRAYLON JORDAN**                                                    **PLAINTIFFS**

**VS.**                                    **CIVIL ACTION NO. 3:15-cv-00220-CWR-LRA**

**MAXFIELD & OBERTON HOLDINGS, LLC;**
**CRAIG ZUCKER, ASSEMBLE LLC; GREAT**
**AMERICAN E&S INSURANCE COMPANY;**
**ALTERRA EXCESS and SURPLUS INSURANCE**
**COMPANY f/k/a MAX SPECIALTY INSURANCE**
**COMPANY; EVANSTON INSURANCE**
**COMPANY; MARKEL INSURANCE COMPANY, INC.;**
**SCOTTSDALE INSURANCE COMPANY;**
**INDIAN HARBOR INSURANCE COMPANY, and**
**DOES 5 - 15**                                                        **DEFENDANTS**

---

**THIRD AMENDED COMPLAINT FOR CIVIL DAMAGES**
**AND INJUNCTIVE RELIEF**
_____

**JURY TRIAL DEMANDED**

COME NOW Plaintiffs Meaghin Jordan, Individually; Jonathan Jordan, Individually;

Meaghin and Jonathan Jordan, on behalf of their minor son, Braylon Jordan, and file their Third

Amended Complaint for Civil Damages and Injunctive Relief against Defendants Maxfield &

Oberton Holdings LLC; Craig Zucker; Assemble LLC; Great American E&S Insurance

Company; Alterra Excess and Surplus Insurance Company f/k/a Max Specialty Insurance

Company; Evanston Insurance Company; Markel Insurance Company, Inc.; Scottsdale Insurance

Company; Indian Harbor Insurance Company, and Does 5 - 15, as follows:

# I.
## PARTIES

1.      Plaintiffs Meaghin Jordan, Jonathan Jordan, and Braylon Jordan (their minor son)

are resident citizens of the State of Mississippi.  Plaintiffs reside at 214 Wadsworth Road,

Pelahatchie, MS 39145.

2.      Defendant Maxfield & Oberton Holdings, LLC ("M&O LLC") is a Delaware

limited liability company that filed a Certificate of Cancellation on December 27, 2012.  Upon

information and belief, Pursuant to M&O LLC's charter and other organizing documents,

M&O LLC was organized, existed, and/or dissolved pursuant to the Delaware General

Corporation Laws, and remains amenable to suit in Mississippi for a period of three years ending

December 27, 2015.  M&O LLC is a foreign limited liability company that has committed a tort,

in whole or in part, in the state of Mississippi and otherwise has done and is doing business in

this State and may be served with process of this Court through its registered agent for service of

process: Incfile.com, LLC, 9 East Loockerman St., Suite 215, Dover, Delaware 19901.

M&O LLC is an entity that exists separate and distinct from The RICO Enterprise.

3.      Defendant Craig Zucker ("Zucker"), is a resident individual of the State of New

York that has committed a tort, in whole or in part, in the State of Mississippi, and otherwise has

done and is doing business in this State.  Zucker is a non-resident officer of M&O LLC and may

be served with process of this Court through M&O LLC's registered agent for service of process:

Incfile.com, LLC, 9 East Loockerman St., Suite 215, Dover, Delaware 19901.  Zucker is a

non-resident officer of Assemble LLC and may also be served with process of this Court through

Assemble LLC's agent for service of process: The Corporation Trust Company, Corporation

Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Craig Zucker is an individual existing separate and distinct from The RICO Enterprise.

4.      Defendant Assemble LLC is a Delaware limited liability company that has committed a tort, in whole or in part, in the state of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court through its registered agent for service of process: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.  Assemble LLC is an entity that exists separate and distinct from The RICO Enterprise.

5.      Defendant Great American E&S Insurance Company ("Great American") is a foreign insurance company that has committed a tort, in whole or in part, in the state of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court at its principal place of business: Great American Insurance Group Tower, 301 East 4th Street, Cincinnati, Ohio 45202.  Great American is a foreign insurance company existing separate and distinct from The RICO Enterprise, and is included in the group "The Insurance Defendants."

6.      Defendant Alterra Excess and Surplus Insurance Company f/k/a Max Specialty Insurance Company ("Alterra") is a foreign insurance company that has committed a tort, in whole or in part, in the state of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court at its principal place of business: 4600 Cox Road, Glen Allen, Virginia 23060.  Alterra is a foreign insurance company existing separate and distinct from The RICO Enterprise, and is included in the group "The Insurance Defendants."

7.     Defendant Evanston Insurance Company ("Evanston") is a foreign insurance company that has committed a tort, in whole and in part, in the State of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court at its principal place of business: Ten Parkway North, Deerfield, IL 60015. Evanston is a foreign insurance company existing separate and distinct from the RICO Enterprise, and is included in the group "The Insurance Defendants."

8.     Defendant Markel Insurance Company, Inc. ("Markel") is a foreign insurance company that has committed a tort, in whole and in part, in the State of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court at its principal place of business: 4600 Cox Road, Glen Allen, VA 23060. Markel is a foreign insurance company existing separate and distinct from the RICO Enterprise, and is included in the group "The Insurance Defendants."

9.     Defendant Scottsdale Insurance Company ("Scottsdale") is a foreign insurance company that has committed a tort, in whole and in part, in the State of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court at its principal place of business: One Nationwide Plaza, Columbus, Ohio 43215.  Scottsdale is a foreign insurance company existing separate and distinct from the RICO Enterprise, and is included in the group "The Insurance Defendants."

10.    Defendant Indian Harbor Insurance Company ("Indian Harbor") is a foreign insurance company that has committed a tort, in whole or in part, in the state of Mississippi and otherwise has done and is doing business in the State of Mississippi and may be served with process of this Court at its principal place of business: Seaview House, 700 Seaview Avenue,

Stamford, Connecticut 06902-6040.  Indian Harbor is a foreign insurance company  existing

separate and distinct from The RICO Enterprise, and is included in the group "The Insurance

Defendants."

11.     Defendants Does 5 through 15 are Defendants and/or RICO Defendants whose

identities are currently unknown that have committed a tort, in whole or in part, in the state of

Mississippi and otherwise have done and are doing business in the State of Mississippi.

Plaintiffs will supplement their Third Amended Complaint with the names of Defendants

Does 5 - 15 when they become known.

## II.
## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 and venue

is proper in the Northern Division.  This Court has personal jurisdiction over the parties.

## III.
## FACTS[1]

### The Buckyballs'® Story

13.     Maxfield & Oberton Holdings LLC ("M&O LLC") commenced operations in

March 2009 under the leadership of its equal partners Craig J. Zucker and Jake Bronstein.[2]

14.     M&O LLC and M&O LLC's owners marketed and distributed the Buckyballs®

toy product throughout the United States and 20 foreign countries, including Mississippi.

15.     The Buckyballs product consists of small individual industrial strength ("rare

---

[1] In this section, Plaintiffs will identify general facts relevant to all claims.  Additional facts specific to Plaintiffs' causes of action will be pled throughout this Third Amended Complaint.

[2] Zucker and Bronstein may be referred to herein collectively as "M&O LLC's owners."

earth") spherical magnets that are packaged as an aggregate cubed-shaped mass in different sized

containers holding as many as 216 individual spheres approximately 5 millimeters in size.

Doc. # 41-1.

  16. Buckyballs were sold in the US through retailers and through various internet

websites.

  17. Pursuant to Section 19 of the Consumer Product Safety Act ("CPSA") it is now

illegal "for any person to sell, offer for sale, manufacture, distribute in commerce or import into

the United States any Buckyballs or Buckycubes."

  18. M&O LLC's rare earth magnet products (Buckyballs®, Bucky Bigs®,

Buckybars®, and Buckycubes®) continue to be available for sale on the internet through the

buckyballsstore.com website. Doc. #41-2.  Upon information and belief, M&O LLC, Zucker

and/or Bronstein continue to receive funds, and/or otherwise benefit, from these sales.  Plaintiffs

reserve the right to investigate further and assert such sales and receipt of funds/benefits as part

of their Causes of Action in this Third Amended Complaint.

  19. Zucker and/or Assemble LLC sold and/or continue to sell Buckyballs as a novelty

item permanently encased in transparent Lucite®, with all profits from such sales going

personally to Zucker.

  20. M&O LLC and Zucker marketed Buckyballs to children.  Buckyballs were

compared to "An Erector Set® that never stops erecting; a Hula-Hoop® you don't look

ridiculous playing with; Silly Putty® that isn't silly; cram it all in a jar, turn the fun up to 11, and

you've got Buckyballs!"  Craig Zucker later lamented in the media: "We coulda been a Leggo®!

We coulda been a Rubik's® Cube!"

21.     M&O LLC also marketed Buckyballs as an "amazing magnetic toy," encouraging consumers to use them in games, use them to hold items to a refrigerator, and "wear them as jewelry."  In a 2009 advertisement video, M&O LLC displayed a consumer using Buckyballs magnets to simulate a tongue piercing.

22.     By 2012, over 2.8M sets of Buckyballs had been sold to consumers in the United States generating over $57M in sales in just four years.   Zucker anticipated that revenue for 2012 would be $25M.

23.     The inherent/generic selling characteristic of Buckyballs is their strong and permanent magnetism.  Unlike common magnets which are made of an iron alloy, Buckyballs are made of neodymium, a rare earth metal, hence the name "rare earth" magnet.  Rare earth magnets are the strongest type of permanent magnets that can be manufactured.

24.     The intense magnetic properties of Buckyballs are so powerful that, if swallowed, they can pinch and perforate any tissue caught between them.  "When two are ingested they have a way of finding one another.  When they catch a loop of intestine, the pressure leads to loss of blood supply, tissue rot, perforation and potentially death." Buckyballs are "[A]n inappropriate use of an industrial-strength magnet."

25.     Throughout the history of Buckyballs, there have been numerous reported and documented incidents of children being severely injured by the ingestion of rare earth magnets, generally, and Buckyballs, specifically.  Many of these incidents predated the injury to Plaintiff Braylon Jordan.  The following are representative examples of severely injured children who required medical intervention:

a)      <u>January 2010</u>  A nine year old boy used Buckyballs to mimic a tongue piercing and swallowed seven magnets.  He was treated at an emergency room.

b)      <u>September 2010</u>  A twelve year old girl swallowed two Buckyballs.  She was treated and monitored for infection and damage to her gastrointestinal tract.

c)      <u>December 2010</u>  A three year old girl swallowed eight Buckyballs she  found on a refrigerator in her home.  The magnets became imbedded in the girl's trachea and esophagus, requiring surgical removal after causing intestinal and stomach perforations.

d)      <u>January 2011</u> A four year old boy suffered intestinal perforations after swallowing three Buckyballs he thought were chocolate candy because they looked like the decorations on his mother's wedding cake.

e)      <u>January 2012</u>   A ten year old girl swallowed two Buckyballs after using them to mimic a tongue piercing.  The magnets became imbedded in her large intestine, requiring surgical removal.

f)      <u>February  2012</u>   A three year old girl swallowed thirty-seven Buckyballs that were revealed by an X-ray showing the circular chain in her stomach.  The 37 magnets snapped the girl's intestines together, tearing three holes into her lower intestine and one hole into her stomach before they could be surgically removed.

g)      <u>March 2012</u> A twelve year old girl was simulating a tongue piercing at school when she swallowed Buckyballs.  She was hospitalized for six days and required two surgeries to remove the balls from her intestines.

26.     Although M&O LLC and M&O LLC's owners marketed Buckyballs for use as a toy by children and/or other age inappropriate individuals, children cannot and could not appreciate the hazard associated with swallowing the intensely powerful industrial magnets.

27.     As a result of the above events, and numerous other reported incidences of injury, M&O LLC and its owners knew or should have known that children similar in age to Braylon Jordan would mouth the Buckyballs and/or swallow them.

### The CPSC Campaign to Remove Buckyballs from the Market

28.    From March 2009 (the date of the first US sale) to January 2010, the Consumer

Product Safety Commission ("CPSC") documented multiple cases of children being severely

injured from swallowing Buckyballs.

29.    In February 2010, the CPSC approached M&O LLC notifying the company that

Buckyballs did not meet the labeling and warning requirement for such products.  Original

Buckyballs were sold in a glass jar with a product identification label, but no warning.

M&O LLC and it owners originally cooperated by changing the packaging, warnings, and

labeling on Buckyballs.

30.    M&O LLC also participated in a voluntary recall of Buckyballs.  On May 27,

2010, the CPSC and M&O LLC jointly issued a press release announcing: "*Buckyballs High

Powered Magnet Sets Recalled by Maxfield and Oberton due to violation of Federal Toy

Standard.*"  The recall resulted in approximately only 50 units returned.

31.    At the time of the recall, M&O LLC and its owners were aware of multiple

incidents of ingestion injuries to children.  In addition, at or near the time of the recall,

M&O LLC's owners had refused their staff's requests to stop the sale of Buckyballs and submit a

corrective action plan for all of M&O LLC's rare earth magnet products. [3]

32.    In connection with the recall, M&O LLC changed the Buckyballs' warning in an

attempt to remove it from the scope of the mandatory provisions of ASTM International

F963-08, *Standard Consumer Safety Specification for Toy Safety*, prohibiting the sale of loose

---

[3] M&O LLC also sold Buckycubes® which, as the name indicates, were cube-shaped rare
earth magnet versions of Buckyballs.

magnet toys to children.

33.     In November 2011, M&O LLC participated with the CPSC in a series of public service announcements to create public awareness for the dangers associated with the ingestion of rare earth magnets by children.  Despite these efforts, reported incidents of magnet ingestion by children increased from 13 in 2010, to 19 in 2011, and 52 in 2012, with the largest spike seen after Christmas 2011.

34.     Although M&O LLC changed its warning and cooperated in public service announcements, M&O LLC and its owners continued to market the product for use by children and/or age inappropriate consumers by comparing Buckyballs to Erector Sets®, Hula-Hoops®, Silly Putty®, the Slinky®, and Lego®, thus making such warnings and labeling wholly ineffective.

35.     In 2012, during testimony before Congress, CPSC Chairwoman Inez Tenenbaum was questioned about "the Buckyballs stir" by Tennessee Representative Marsha Blackburn. Rep. Blackburn identified herself as the grandmother of two children, ages 4 and 3.  Rep. Blackburn questioned the CPSC's "hard-line stand against Buckyballs", comparing the industrial magnet toy to the innocent "Hungry Hungry Hippos® and a fishing well game," both games for small children.

36.     Regardless of the warnings placed on the Buckyballs toy, reasonable consumers, including reasonable consumer congress persons, considered the industrial magnet toy a toy for young children.

37.     In May 2012, the CPSC Compliance staff contacted 13 importers of magnet sets asking that they provide reports required by Section 15 of the Consumer Product Safety Act.

Most of the companies agreed to provide the requested information and voluntarily agreed to stop selling magnet sets pending an evaluation of the products by the CPSC.  M&O LLC and its owners did not agree to stop selling Buckyballs.

38.    In July 2012, the CPSC contacted M&O LLC directly asking that it stop selling Buckyballs and initiate a voluntary recall of its rare earth magnet products.  M&O LLC and its owners did not agree to initiate a voluntary recall.  M&O LLC and its owners did not agree to stop selling Buckyballs or any of its rare earth magnet products.

39.    On  July 25, 2012, the CPSC filed an Administrative Complaint against M&O LLC after its discussions with the company and its owners failed to result in a voluntary recall plan and/or the termination of product sales.  *See, In the Matter of Maxfield and Oberton Holdings, LLC*, CPSC Docket No. 12-1, United States of America Consumer Products Safety Commission.  CPSC Complaint Counsel requested that the Commission reach a determination that M&O LLC's Buckyballs and rare earth magnet products presented a "substantial product hazard within the meaning of § 15 U.S.C. § 2064(a)(2)."  CPSC Complaint Counsel also requested that the Commission enter an Order pursuant to § 15 U.S.C. § 2064(c)(section 15(c) of the CPSA) requiring M&O LLC to "cease importation and distribution of the product [Buckyballs and Buckycubes]."

40.    On September 4, 2012, the CPSC published a notice of proposed rulemaking ("NPR") in the federal register to address the unreasonable risk of injury associated with rare earth magnet/ neodymium based products, including Buckyballs.  These risks include, but are not limited to, the following:

Magnet sets have some appeal for virtually all age groups. These types of magnets tend to capture attention because they are shiny and reflect light. They are smooth, which gives the magnets tactile appeal, and these magnets make soft snapping sounds as they are manipulated. These properties or characteristics of magnets are likely to seem magical to younger children and may evoke a degree of awe and amusement among older children and teens. These features are the foundation of the magnet sets' appeal . . .

Children, from toddlers through teens, have been exposed to magnet sets in the home setting and elsewhere. As the NPR preamble notes, we [CPSC] have reports of ingestion incidents that involve children 5 years of age and younger. The reports reflect similar scenarios to other ingestion incidents among this age group because mouthing and ingesting non-food items is a normal part of preschool children's exploratory behavior. In a number of reported incidents, the magnets were not in there original containers, and care givers were unaware that some of the magnets from the set were missing and in the child's possession . . .

Thus, it is foreseeable that some portion of these products will be purchased for elementary school children and teens. Moreover, given the relatively low cost for some magnet sets, elementary school children and teens may purchase the magnet sets themselves. The incident reports reflect behaviors that are beyond the intended use of the product but that are foreseeable for the groups using them. For example, it is foreseeable that some children will place these magnets in their mouth, even if the manufacturer warns against this behavior.[4]

41.    By late Fall 2012, M&O LLC and its owners knew that either through the CPSC administrative action or through the CPSC's final rule making authority, it would eventually become illegal to sell Buckyballs in the United States.

42.    On December 27, 2012, M&O LLC, Zucker and Bronstein filed or caused to be

---

[4] *See,* CPSC briefing packages for the proposed and final magnet set rule, available on the CPSC's website at: www.cpsc.gov/PageFiles/128934/magnetstd.pdf (NPR briefing package); www.cpsc.gov/Global/Newsroom/FOIA/CommissionBriefingPackages/2014/SafetyStandardfor MagnetSets-FinalRule.pdf (Final Rule Briefing Package). *See, also,* 77 F.R. 53781-01 (September 4, 2012).

filed M&O LLC's Certificate of Cancellation with the Secretary of State of Delaware.  Zucker

and Bronstein then equally split the remaining money .  After taking his share of the remaining

M&O LLC money, Zucker left the country with his girlfriend for a six week vacation in

Thailand.

43.      Upon information and belief, the filing of the certificate of cancellation was with

the consent, approval and pursuant to a plan or scheme with the general and/or excess liability

insurance carriers for M&O LLC, including The Insurance Defendants.  The unlawful purpose of

the scheme was to avoid CPSC regulatory fines and penalties, void applicable general liability

and excess insurance coverage, leave insufficient corporate assets to pay claims, and allow Craig

Zucker and Jake Bronstein to raid M&O LLC's corporate assets for their own personal benefit.

The Insurance Defendants participation in the plan, scheme, and/or conspiracy is more

particularly described in the Federal Civil RICO and Civil Conspiracy Counts of this Third

Amended Complaint.

44.      On February 11, 2013, the CPSC moved to amend its Administrative Complaint

in *In the Matter of: M&O LLC* to "add Craig Zucker as a Respondent, both in his capacity as

Chief Executive Officer of M&O and in his individual capacity."  Over Zucker's objection, the

Commission granted the motion and Zucker was added to the administrative action.  The

administrative action was dismissed on May 14, 2014.

45.      On September 24, 2014, the CPSC passed a consumer product safety standard

banning the sale of rare earth magnet products in the US.  The standard, found at 16 C.F.R.

§ 1240, *et. seq.*, took effect on April 1, 2015.

-13-

## The Defendants Conspire to Defeat Claims

46.     In the months heading up to the filing of M&O LLC's December 27, 2012 certificate of cancellation, Zucker and M&O LLC aggressively marketed and sold the company's remaining inventory through their suggestively phrased *"Save Our Balls"* internet campaign.  By one estimate, over 300,000 units were sold.  During a four week period, sales increased 2700% over the same period in 2011.

47.     By December 2012, M&O LLC was involved in civil litigation involving the sale of Buckyballs.  *Sabrina Lopez v. Maxfield and Oberton , LLC*, a personal injury lawsuit, was filed in California in October 2012.  *Estate of Buckminister Fuller v. Maxfield and Oberton, LLC,* an intellectual property lawsuit, was filed in California in May 2012.  Upon information and belief, there were other existing known claims including, but not limited to, Plaintiffs' claims.

48.     By December 2012, the CPSC was aggressively pursuing M&O LLC in the CPSC Administrative Claim.  Multiple additional lawsuits against M&O LLC, Zucker and/or Bronstein were anticipated.

49.     Great American issued one or more policies of insurance to M&O LLC including, but not limited to: Policy No. PL 2388601-00.  Such policy(s) were and are available to pay general liability, excess liability, and/or cost of defense for covered claims against M&O LLC, Zucker and Bronstein.

50.     Alterra issued one or more policies of insurance to M&O LLC including, but not limited to: Policy No. MAX 013100003783.  Such policy(s) were and are available to pay general liability, excess liability, and/or cost of defense for covered claims against M&O LLC,

Zucker and Bronstein, including but no limited to Plaintiffs' claims.

51.    Indian Harbor issued one or more policies of insurance to M&O LLC including, but not limited to: Policy No. ESG0038310.  Such policy(s) were and are available to pay general liability, excess liability, and/or cost of defense for covered claims against M&O LLC, Zucker and Bronstein, upon information and belief, including but not limited to Plaintiffs' claims.

52.    Evanston issued one or more policies of insurance to M&O LLC including, but not limited to: Policy No. XCNJ112111.  Such policy (s) were and are available to pay general liability, excess liability, and/or cost of defense for covered claims against M&O LLC, Zucker and Bronstein, including but not limited to Plaintiffs' claims.

53.    By 2012, one or more of The Insurance Defendants were on notice to pay cost of defense and/or indemnity for the *Lopez* claim, and/or the *Estate of Buckminster* claim, and/or other anticipated known claims, including Plaintiffs' claims.

54.    In October 2012, Alterra filed a "Dec Action" in California state court (*Alterra v. Maxfield and Oberton Holdings, LLC)* asking for a "no coverage" opinion and for reimbursement of litigation costs associated with the *Estate of Buckminster Fuller* case.  M&O LLC originally defended demanding coverage and objecting to reimbursement of costs.

55.    With M&O LLC's consent and agreement, on December 10, 2012, **seventeen days before M&O LLC's certificate of cancellation was filed,** Alterra filed an Amended Complaint asking for the same "no coverage" opinion and for reimbursement of costs. This time, instead of defending, M&O LLC filed a two sentence Answer admitting all allegations **and** consenting to reimbursement of costs.

56.    M&O LLC, a company facing ongoing and future litigation, took unprecedented

steps to void its insurance coverage **and** pay covered litigation costs at a time when its owners, Zucker and Bronstein, were stripping the company of its money and other corporate assets.

57.     In 2011, M&O LLC revenues were approximately $18M.  In 2012, M&O LLC was on track to make $25M in revenues.

58.     In connection with filing a certificate of cancellation and winding up the business affairs of M&O LLC, M&O LLC, Zucker and Bronstein were required by law to set aside sufficient funds for the creation of a liquidating trust to pay current and future administratively filed claims ("The MOH Liquidating Trust").  Although M&O LLC was making tens of millions of dollars, M&O LLC, Zucker and Bronstein set aside only $350,000.  After defending the CPSC claim, The MOH Liquidating Trust has only $100,000 to pay approximately 380 claims, 6 of which are personal injury damage claims.

59.     In violation of the corporate dissolution laws, Zucker, Bronstein, and M&O LLC conspired with The Insurance Defendants to void coverage and strip the company of its assets.

60.     With the knowledge and consent of all Defendants, and/or pursuant to a plan or conspiracy among them, the business of M&O LLC was wound up in violation of applicable law and its certificate of cancellation is a nullity or is subject to nullification.

61.     M&O LLC, Zucker and/or Bronstein underfunded The MOH Liquidating Trust as part of the plan or conspiracy with The Insurance Defendants to make sure that Zucker and Bronstein would get all the money **and** The Insurance Defendants would not have to defend or indemnify against any existing or future claims.  The key component of the plan or conspiracy for The Insurance Defendants was the filing of the certificate of cancellation.

62.     On the day that M&O LLC's certificate of cancellation was filed (December 27,

2012), M&O LLC, Zucker and/or Bronstein caused to be filed a "Notice of Withdrawal of Counsel" in the CPSC Administrative Action claiming "Maxfield and Oberton no longer exists."

63.     Once the certificate of cancellation was filed, The Insurance Defendants began taking a "no coverage" position in all pending and future civil litigation claiming M&O LLC did not exist, i.e. there was no "insured" under their policies of insurance.

64.     The *Sabrina Lopez* case was dismissed. The *Finn Thompson Case* (a child's Buckyballs personal injury case in Colorado) would eventually be dismissed.  Upon information and belief, there are other children's personal injury cases that were dismissed as a result of The Insurance Defendants' "no coverage" position and the "non-existence" of M&O LLC.

65.     M&O LLC and Great American have taken the same "non-existence" and "no coverage" position in this case with regard to Plaintiffs' claims.

66.     The plan or conspiracy between the Defendants allowed Zucker and Bronstein to strip M&O LLC of its assets in violation of applicable law, and allowed M&O LLC and The Insurance Defendants to walk away from existing and future claims.  Because the plan or conspiracy required specific identifiable acts in violation of the law, Defendants are also liable to Plaintiffs under Federal Civil RICO and civil conspiracy, as described more fully herein.

67.     On April 24, 2012, M&O LLC through Zucker received an internet news article describing serious and permanent injuries to then twenty-two month old Braylon Jordan as a result of swallowing eight magnetic Buckyballs.

68.     The Braylon Jordan news article was reported to Great American, Markel, Evanston, and Scottsdale as a first report of loss.  Through additional information received during the claims handling process, Great American, Markel, Evanston, and Scottsdale became

-17-

aware that the injuries to Braylon Jordan would potentially exceed the amount of insurance coverage under the Great American, Evanston, and Scottsdale Policies.

69.     Markel is the parent company of Alterra and Evanston.  Markel processes claims for Alterra and Evanston insureds, such as a M&O LLC.  Collectively, Markel, Alterra, and Evanston will be referred to as "The Markel Defendants."

70.     The Markel Defendants, individually and/or through their relationship with each other, learned in 2012 that claims against M&O LLC would exceed the coverage limits under the Alterra and Evanston policies.

71.     At the end of the Great American, Evanston, and Scottsdale policy periods, coverage for M&O LLC was placed with Indian Harbor.  M&O LLC and Zucker were unconcerned with the high cost of the Indian Harbor policy because M&O LLC, Zucker, and The Insurance Defendants already had a plan in place to take M&O LLC out of existence as a suable entity by terminating its existence in December 2012.

72.     By November 2012, and upon information and belief earlier, Zucker was discussing in emails with The Insurance Defendants the plan to terminate M&O LLC and cancel all insurance coverage, including but not limited to the Indian Harbor Policy, by late December 2012.

73.     Individuals who participated in and/or who had specific knowledge of the conspiracy to defeat claims filed and to be filed against M&O LLC, including, but not limited to Braylon Jordan's claim, are: Zucker (M&O LLC), Ryan Gillespie (Great American), Alton Wright (The Markel Defendants), Deborah Sinatra and Joann Mannetter (Scottsdale), and Yonathan Casilla (Indian Harbor).  Additional individuals in the claim departments and

underwriting departments of each of the Insurance Defendant companies will be identified

through discovery.

**Braylon Jordan's Story**

74.     Braylon Jordan was born in 2010.

75.     On March 9, 2011, Meaghin Jordan (Braylon's mother), bought a set of

Buckyballs for $29.99 at Diamondhead Pharmacy and Gifts, Inc. ("Diamondhead Gifts") in

Diamondhead, Mississippi.  Doc. # 41-3.

76.     The Buckyballs toy was purchased as a gift for Jonathan Jordan (Braylon's father

and Meaghin's husband).

77.     At the time of purchase, Meaghin Jordan and Jonathon Jordan did not recognize

or understand, nor were they made aware of, the risk of severe gastrointestinal pinching injury

from swallowing Buckyballs magnets.

78.     The Jordans made every effort to keep the Buckyballs magnets away from

Braylon Jordan, storing them in the back of a kitchen drawer out of Braylon's reach.

79.     In April 2012, the Jordans discovered that Braylon had swallowed 8 Buckyballs

magnets.

80.     On the night of April 2, 2012, Braylon began vomiting.  He vomited periodically

throughout the night.  The Jordans believed that Braylon had a stomach virus.

81.     Braylon continued to vomit the next day.  On April 3, 2012, the Jordans took

Braylon to an urgent care clinic in Diamondhead, Mississippi.  They were then sent to Hancock

Medical Center in Bay St. Louis, Mississippi.  At Hancock Medical Center, an x-ray revealed

8 Buckyballs magnets in Braylon's stomach.  Emergency room doctors at Hancock Medical

Center advised the Jordans that Braylon would need surgery to remove the magnets.

82.     Braylon was transferred to Children's Hospital of New Orleans.

83.     On April 5, 2012, Braylon's doctors determined that surgery was necessary.  They operated to remove the 8 Buckyballs magnets.  The surgeons discovered that the Buckyballs magnets had perforated Braylon's intestines.  At the time of the surgery, Braylon was 22 months old.

84.     On April 8, 2012, Braylon developed a high fever, and bile was leaking from his surgical incision.  Braylon was rushed to the intensive care unit, and then had emergency surgery.  The surgeon discovered an additional intestinal perforation.  The surgeon repaired the perforation and drained fluid from Braylon's abdomen.  The surgeon also performed an ostomy to carry waste outside of Braylon's body and into an ostomy bag.

85.     On April 10, 2012, the surgeon discovered a necrotic piece of small intestine while inspecting Braylon's ostomy.  Braylon underwent a third surgery to remove the necrotic piece of small intestine.  The surgeon determined that a blood clot had cut off the blood supply to his small intestine, and that much of his intestinal tissue had died.  The surgeon amputated the majority of Braylon's small bowel and all but ten to fifteen centimeters of his small intestine.

86.     Over the next two months, Braylon underwent numerous additional procedures to clean the wound, insert catheters, maintain his ostomy bag, and remove additional necrotic and infected tissue.

87.     After Braylon's intestines and bowel were removed, it was unknown if he would survive.  His blood work results were bad.  He was kept in an induced coma and on a respirator.

88.     After being brought out of the induced coma, Braylon had to relearn how to sit up, how to use his hands, and how to walk.  It was difficult to keep the ostomy bag on him because he was so small.

89.     Braylon Jordan was a healthy 22 month old little boy before swallowing the Buckyballs magnets.  As the result of ingesting the magnets, Braylon requires constant care from his physicians, his father, and his mother.

90.     To obtain the necessary nutrients to survive, Braylon is given a solution through a main line that doctors inserted into one of his blood vessels.  This system is called Total Parenteral Nutrition.  To ease the burden on his liver, Braylon is fed formula through a separate tub that goes directly to his stomach.

91.     Braylon can eat food by mouth, but the food passes through his system without being digested.  He receives no significant amount of nutrition from the food he eats.  Braylon is allowed to eat by mouth so that he experiences the taste and sensations of food.

92.     Braylon carries a backpack with an infusion pump and solution packet that feeds nutrients into his body 24 hours a day.  He has less energy than other children.  At school, he gets tired and does not play as much as the other children.  Braylon's bathroom habits at school are not as the other children.  When he voids, it makes a loud noise and it smells bad, which causes him embarrassment.

93.     Braylon may need a bowel transplant and a liver transplant.  Until that determination is made, the family will participate in an intestinal rehabilitation program.  The program will require the family to travel to Nebraska.

94.     Medical and other expenses related to Braylon's swallowing 8 Buckyballs are in

excess of $1,500,000.  Total future medical and other expenses are unknown at this time and will

be proven a trial.

## IV.
## CAUSES OF ACTION

### COUNT ONE
### STRICT PRODUCT LIABILITY-FAILURE TO WARN

95.     Plaintiffs incorporate by reference all allegations contained in their Third

Amended Complaint.

96.     M&O LLC was in the business of designing, testing, manufacturing, marketing,

distributing, and/or selling Buckyballs, including the subject Buckyballs that seriously injured

Braylon Jordan, within the meaning of Miss.Code Ann. § 11-1-63, the Mississippi Products

Liability Statute.

97.     Upon information and belief, Diamondhead Gifts did not exercise control over the

design, testing, manufacturing, packaging or labeling of the subject Buckyballs.

98.     Upon information and belief, Diamondhead Gifts did not alter or modify the

subject Buckyballs.

99.     Upon information and belief, Diamondhead Gifts did not have actual or

constructive knowledge of the defective conditions pled in this Third Amended Complaint

(warning or design) of the subject Buckyballs, at the time Diamondhead Gifts supplied the

product for sale.

100.    Upon information and belief, Diamondhead Gifts was a mere conduit of the

product, an innocent seller of the subject Buckyballs.

101.    At the time the subject Buckyballs left the control of M&O LLC, they were

-22-

defective and unreasonably dangerous for failure to contain adequate warnings or instructions. At the time the subject Buckyballs left the control of M&O LLC, M&O LLC knew or in light of reasonably available information should have known about severe gastrointestinal pinching injuries that could occur in children of or near the same age as Braylon Jordan as a result of multiple rare earth magnets being swallowed, including, but not limited to, Buckyballs rare earth magnets.

102.    It was foreseeable and reasonably expected by M&O LLC that Buckyballs would be mouthed and/or swallowed by small children, causing severe and irreversible gastrointestinal injury for the following reasons:

a)    M&O LLC and its owners compared Buckyballs to children's toys.

b)    Reasonable consumers perceived Buckyballs as children's toys.

c)    Buckyballs were being made available for sale in children's toy stores.

d)    The inherent properties and characteristics of the extremely powerful Buckyballs industrial magnets made them attractive to children (e.g. their smooth and tactile appeal, the soft snapping sounds produced when manipulated, and their shiny and reflective surface).

e)    Buckyballs magnets have the appearance of a food item.

f)    Braylon Jordan and other children in his age group have a tendency to mouth and/or ingest non-food items as a normal part of their exploratory behavior.

g)    There were a large number of similar reported incidents involving ingestion of rare earth magnets by small children prior to the injury sustained by Braylon Jordan.

h)    Other incidents of foreseeability to be shown at the trial of this cause.

103.    Braylon Jordan was too young to know or appreciate the danger of severe gastrointestinal pinching injuries that could result from swallowing multiple Buckyballs magnets.

Ordinary adult users/consumers, such as Meaghin and Jonathan Jordan, would be unable to understand or appreciate the risk of severe gastrointestinal pinching injuries that could be suffered by children as a result of swallowing the extremely powerful Buckyballs industrial magnets.

104.     M&O LLC and M&O LLC's owners' marketing and advertising of Buckyballs conflicted with the stated warnings on the Buckyballs packages.  Although Buckyballs packaging indicated that the product was not intended for children, M&O LLC and M&O LLC's owners continuously and aggressively advertised and marketed the product as similar to other children's toys such as: an Erector Set, a Hula-Hoop, Silly Putty, a Slinky, and LEGOs.

105.     M&O LLC and M&O LLC's owners' marketing and advertising of Buckyballs conflicted with the purported use of the product as a "desk toy."  It was reasonably foreseeable and reasonably expected by M&O LLC that typical adult consumers, such as Meaghin and Jonathan Jordan, would view and did view the product as a toy sold for home use.

106.     Because the advertising and marketing of Buckyballs conflicted with the stated warnings and the purported use of the product as a desk toy, the effectiveness of the warnings placed on the product by M&O LLC and its owners were diminished and/or rendered completely ineffective.

107.     At the time the subject Buckyballs left the control of M&O LLC, they were defective and unreasonably dangerous because there are no warnings or instructions that could have been devised that would have effectively communicated the severe risk of a gastrointestinal pinching hazard so that such warnings and instructions could be understood by the ordinary user/consumers of the Buckyballs product in order to reduce the number of magnet ingestion

incidents.  There is no warning that could have made the Buckyballs product reasonably safe for use by ordinary users/consumers.

108.    It is illegal to manufacture, distribute, and/or sell Buckyballs in the United States.

109.    Zucker is liable for M&O LLC's failures to warn as described in additional Counts of this Third Amended Complaint.

110.    As a direct and proximate result of M&O LLC's failures to warn, Braylon Jordan was severely and permanently injured.

111.    As a direct and proximate result of M&O LLC's failures to warn, Meaghin, Jonathan and Braylon Jordan suffered damages as are more particularly described herein.

## COUNT TWO
## STRICT LIABILITY - DEFECTIVE DESIGN

112.    Plaintiffs incorporate by reference all allegations contained in their Third Amended Complaint.

113.    At the time the subject Buckyballs left the control of M&O LLC, the design of the subject Buckyballs was defective and unreasonably dangerous due to the inherent characteristic of the product to cause intestinal pinching injuries in children of or near the same age as Braylon Jordan as a result of multiple Buckyball magnets being swallowed.  At the time the subject Buckyballs left the control of M&O LLC, M&O LLC knew or, in light of reasonably available information, should have known that the inherent characteristic of the design of the product could cause intestinal pinching injuries in children of or near the same age as Braylon Jordan as a result of multiple Buckyball magnets being swallowed.

114.    It was foreseeable and reasonably expected by M&O LLC that Buckyballs would

be mouthed and/or swallowed by small children, causing severe and irreversible gastrointestinal injury for the following reasons:

a)      M&O LLC and its owners compared Buckyballs to children's toys.

b)      Reasonable consumers perceived Buckyballs as children's toys.

c)      Buckyballs were being made available for sale in children's toy stores.

d)      The inherent properties and characteristics of the extremely powerful Buckyballs industrial magnets made them attractive to children (e.g. their smooth and tactile appeal, the soft snapping sounds produced when manipulated, and their shiny and reflective surface).

e)      Buckyballs magnets have the appearance of a food item.

f)      Braylon Jordan and other children in his age group have a tendency to mouth and/or ingest non-food items as a normal part of their exploratory behavior.

g)      There were a large number of similar reported incidents involving ingestion of rare earth magnets by small children prior to the injury sustained by Braylon Jordan.

h)      Other incidents of foreseeability to be shown at the trial of this cause.

115.    Due to the intense magnetic properties of neodymium rare earth magnets, the severe gastrointestinal pinching injuries caused by swallowing multiple Buckyballs magnets is the result of an inherent characteristic that is a generic aspect of the Buckyballs' defective and unreasonably dangerous design.

116.    Braylon Jordan was too young to know, appreciate, or recognize the inherent danger of severe gastrointestinal pinching injuries that could result from swallowing multiple Buckyball magnets.

117.    Ordinary adult users/consumers, with ordinary knowledge common to the community, such as Meaghin and Jonathan Jordan, would not know, appreciate or recognize the

-26-

inherent danger of severe gastrointestinal pinching injuries that could result from swallowing multiple Buckyball magnets.

118.    A feasible alternative design for Buckyballs can be found by increasing their size and altering their severe magnetism by deleting neodymium from the manufacturing process, e.g. manufacturing Buckyballs using soft ferrites. Additional alternative feasible designs will be proven at trial.

119.    Zucker is liable for M&O LLC's defective design of Buckyballs as described in additional Counts of this Third Amended Complaint.

120.    As a direct and proximate result of M&O LLC's defective design of Buckyballs, Braylon Jordan was severely and permanently injured.

121.    As a direct and proximate result of M&O LLC's defective design of Buckyballs, Meaghin, Jonathan and Braylon Jordan suffered damages as are more particularly described herein.

**COUNT THREE**
**CORPORATE OFFICER RESPONSIBILITY**

122.    Plaintiffs incorporate by reference all allegations contained in their Third Amended Complaint.

123.    Craig Zucker is the co-founder and was the Chief Executive Office of M&O LLC. As the CEO, Zucker had primary control of the acts, practices, policies, and regulatory compliance of M&O LLC.

124.    On May 25, 2012, Craig Zucker filed a report on Buckyballs with the CPSC in response to the CPSC's Staffs' request for information pursuant to § 15(b) of CPSA.  In the full

report, Craig Zucker identified himself as the author of the report and the CEO of M&O LLC.  In

his report to the CPSC, Craig Zucker stated: "Craig Zucker is responsible for the development

and enforcement of Maxfield and Oberton's compliance program."

125.    On September 11, 2012, seven days after the CPSC published its Notice of

Proposed Rule Making to address the unreasonable risk of injury associated with rare earth

magnets, including Buckyballs, Craig Zucker wrote a taunting personal email to CPSC

spokesman Scott Wolfson.  The subject line of the taunting email was: "A special thanks from

Buckyballs CEO."  The taunting email read as follows:

> Hey:
>
> Thanks so much for making Thursday's "SaveOnBalls" promo our biggest ever
> and for helping us continue the fight to save our balls.
>
> Just wanted to let you know that Buckyballs and Bucky Bigs are now back in
> stock and that **I have** extended the **sixty percent off everything** promo through
> Sunday, September 16 at www.getbuckyballs.com.
>
> Thanks, Craig

Doc. # 41-4.

126.    After the CPSC filed its Administrative Complaint against M&O LLC, Zucker

attempted to control the debate by scheduling live appearances on network television and radio

news/talk shows.  In August, 2012, Craig Zucker appeared on CNBC to debate the Consumer

Federation of America's Rachael Weintraub.  During that same month, Zucker appeared on

CBS's *Morning Show* and *Your World with Neil Cavuto* on Fox News.  During these

appearances, Zucker intentionally misrepresented the safety history of rare earth magnet products

such as Buckyballs.

-28-

127.   These media appearances by Zucker coincided with his implementation of an aggressive sales program bearing the suggestive title "Save Our Balls."  In a July 27, 2012 promotional piece offered on the "Official Buckyballs Channel," an announcer encourages the viewer to visit www.getbuckyballs.com and buy a set of Buckyballs to "**Stick it to the CPSC**."

128.   On Zucker's Save Our Balls/Buckyballs Blog, between September 5, 2012 and October 11, 2012, Zucker published or caused to be published cartoonish pictures of CPSC members, including Chairwoman Tenenbaum, comparing her to a psychic.  Doc. # 41-5, p. 8. Criticizing the CPSC's logic seeking a ban on Buckyballs, Zucker proposed a ban on beds, coconuts, stars, hot dogs, and hippos.  Doc. # 41-5, pp. 1, 2, 5, 6, and 7.

129.   Zucker offered to donate $10,000 to the American Cancer Society if CPSC spokesman Scott Wolfson would debate him on live television.  Doc. # 41-5, p. 11.   Next Zucker offered to donate the $10,000 if Wolfson would just arm wrestle him.  Doc. # 41-5, p. 9.

130.   Zucker's stunts got M&O LLC a lot of press in the national media.  All the while, M&O LLC and Zucker were trying to sell as many Buckyballs magnet sets as possible.

131.   On his "*Save Our Balls*" Blog, Zucker announced: "Due to their [CPSC] baseless and relentless legal badgering, we've sadly decided to stop production of Buckyballs and Buckycubes.  We still have a few thousand sets in stock, but once we sell those, they're gone for good.  Act fast.  Tell your friends.  Spread the word."  Doc. # 41-5, p. 1.

132.   Upon information and belief, M&O LLC had some 300,000 units in inventory with no retailers left to sell the product.  M&O LLC and Zucker focused their sales efforts on the internet.  As Christmas 2012 grew closer, Zucker held a close out sale.  The banner on the M&O LLC website read:  "BUCKYPOCALYPSE!" along side a countdown clock.  Offering

discounts and promotions, Zucker managed to sell M&O LLC's inventory by Christmas.

133.    Zucker's high profile aggressive media sales program had worked.  During a four week period in 2012, online sales soared 2,700% over the same period in 2011.

134.    On December 27, 2012 Zucker and Bronstein filed or caused to be filed M&O LLC's  Certificate of Cancellation with the Secretary of State of Delaware.  **On that same date**, M&O LLC's counsel served its Notice of Withdrawal in the CPSC administrative proceeding claiming M&O LLC no longer existed and could not be subjected to a civil fine or penalty.

135.    Zucker and Bronstein split equally the money remaining from Zucker's high profile aggressive media sales program. After taking his share, Zucker left the country with his girlfriend for Thailand.

136.    In a subsequent interview with the media, Zucker embraced the entire *Save Our Balls* and BUCKYPOCALYPSE! sales scheme as his own, claiming: "**His campaign** was in keeping with the Buckyball brand - - a fun way to stand up for his company's rights."

137.    In 2013, Zucker created a new company, Assemble LLC.  The business purpose of Assemble LLC is stated on its website *"UNITED WE BALL"*, as follows:  "We make <u>products</u> to support the <u>legal battle</u> of **one individual** against government..." (emphasis added).  Doc. # 41-6, p. 1.

138.    All profits from sales on the Assemble LLC website *"UNITED WE BALL"* are for Zucker's personal benefit.  On the website, Assemble LLC and Zucker tell buyers: "100 % of the profits go towards the legal fees of fighting the Consumer Product Safety Commission's absurd case against Buckyballs® and Craig Zucker."  Doc. # 41-6, p. 1-2.

139.    The Assemble LLC website states that all money raised is for Zucker's legal

defense in the CPSC Administrative Action.  The CPSC case ended with the entry of an Order of

Dismissal on May 14, 2014.

140.    The Assemble LLC website is still live.  Products have been and continue to be

sold long after the CPSC Administrative action ended.  Doc. # 41-6, 7, 10, 11, 13.  Zucker is and

has been personally using, and/or commingling for his personal use, the money from sales on the

Assemble LLC website.  These acts by Zucker amount to fraud by wire and/or fraud by mail, as

more particularly described herein.

141.    On the Assemble LLC website, "*UNITED WE BALL*" unitedweball.org, Zucker is

identified as the "the former CEO of Maxfield and Oberton and outspoken face of [the

M&O LLC] "Save Our Balls" [campaign]."  Doc. # 41-7, p. 2.

142.    The acts of CEO Zucker were part of a scheme, plan and/or conspiracy to

fraudulently transfer assets, deprive Plaintiffs of insurance coverage, and avoid civil fines and

penalties as more particularly described in this Third Amended Complaint.

143.    The acts of CEO Zucker in managing, directing and controlling the affairs of

M&O LLC were the acts of a reckless entrepreneur flooding the market with a dangerous

product, joking about it, taking the money, and then skipping town.

144.    Additional acts to support the individual officer liability of Zucker will be proven

at trial.

145.    For the reasons stated herein, Craig Zucker is personally liable for his own acts in

connection with all claims and causes of action asserted in this Third Amended Complaint

against M&O LLC.

-31-

146.     As a direct and proximate result of Zucker's individual acts and  practices, Meaghin, Jonathan, and Braylon Jordan sustained damages as are more particularly described herein.

### COUNT FOUR
### PIERCING THE M&O LLC CORPORATE VEIL

147.     Plaintiffs incorporate by reference all allegations contained in their Third Amended Complaint.

148.     Zucker exercised complete dominion and control over the acts, practices, and policies of M&O LLC, treating M&O LLC as his alter ego.  Zucker used the corporate entity as a vehicle to commit fraud in order to avoid paying civil claims, penalties, fines, and judgments, including but not limited to the claims of Meaghin, Jonathan and Braylon Jordan.  In addition to those acts pled elsewhere in this Third Amended Complaint, the following individual acts support piercing the corporate veil of M&O LLC to impose personal liability on Zucker for the acts of M&O LLC:

    a)    Zucker stripped M&O LLC of its assets for their own personal use in the face of ongoing administrative and judicial proceedings.

    b)    Zucker stripped M&O LLC of its assets in anticipation of future litigation by known claimants including but not limited to, Meaghin, Jonathan, and Braylon Jordan, rendering M&O LLC insolvent and leaving insufficient cash assets to defend and/or pay such claims.

    c)    Zucker stripped M&O LLC of its assets in the face of ongoing administrative and judicial claims, rendering M&O LLC insolvent and leaving insufficient cash assets to defend and/or pay such claims.

    d)    Zucker's efforts at stripping M&O LLC of its assets and filing a certificate of cancellation was, in part, for the unlawful purpose of hindering, delaying, and/or defrauding, Meaghin, Jonathan & Braylon Jordan in the pursuit of their litigation

claims, as well as other unliquidated claimants similarly situated, including but not limited to the claims of the CPSC.

e)    In anticipation of their planned attempt at dissolution, Zucker commingled M&O LLC's assets with his own, despite his knowledge that M&O LLC, and Zucker had an obligation to commit those same corporate assets to make reasonable provisions to pay all claims and obligations of M&O LLC for the next ten years, including the claims of Meaghin, Jonathan & Braylon Jordan.

f)    Zucker has continued to conduct the business of M&O LLC by authorizing Assemble LLC to use M&O LLC assets (live M&O LLC registered marks) to sell Assemble LLC products for Zucker's personal benefit.

g)    Zucker has continued to conduct the business of M&O LLC by authorizing Assemble LLC to sell M&O LLC products for Zucker's personal benefit.

h)    Zucker used the corporate entity for own personal benefit to conduct the fraudulent transfer of assets, as more particularly described in this Third Amended Complaint.

i)    Additional acts to support piercing the corporate veil of M&O LLC will be proven at trial.

149.    The acts of Zucker were not in furtherance of the legitimate business of M&O LLC.  In the face of known ongoing and future administrative and litigation claims, the legitimate business of M&O LLC would have been to marshal its assets and secure all available insurance coverage.  Instead, Zucker stripped the company of assets and participated in a plan, scheme and/or conspiracy with M&O LLC and The Insurance Defendants to hinder, delay and/or defraud Meaghin, Jonathan and Braylon Jordan from recovering against M&O LLC corporate assets and/or available general liability and excess insurance coverage, all of which was in furtherance of Zucker's personal monetary interests.

150.    Zucker devised and/or participated in plan, scheme, and/or conspiracy with the other Defendants to terminate existing claims and discourage future claims, allowing Zucker and

Bronstein to keep all of the money and assets stripped from M&O LLC and convert them to their

own personal use.  Evidence that the plan or conspiracy worked in favor of all Defendants is pled

in greater detail in this Third Amended Complaint.

151.     As a direct and proximate result of the above acts of Zucker, the corporate veil of

M&O LLC should be pierced to hold Zucker personally liable for all acts of M&O LLC and all

claims against M&O LLC pled in this Third Amended Complaint.

## COUNT FIVE
## PIERCING THE ASSEMBLE LLC CORPORATE VEIL

152.     Plaintiffs incorporate by reference all allegations contained in their Third

Amended Complaint.

153.     Zucker exercised and continues to exercise complete dominion and control over

the acts, practices and policies of Assemble LLC, treating Assemble LLC as his alter ego.

Zucker used the corporate entity as a vehicle to commit fraud by generating funds for his own

personal discretionary use, when he advertised on the Assemble LLC website that profits would

be used to pay his legal defense costs in the CPSC Administrative Action.  Zucker used the

corporate entity as a vehicle to commit fraud in order to avoid paying civil claims, penalties,

fines and judgments, including, but not limited to the claims of, Meaghin, Jonathan and Braylon

Jordan.  In addition to those acts pled elsewhere in this Third Amended Complaint, the following

individual acts support piercing the corporate veil of Assemble LLC to impose personal liability

on Zucker for the acts of Assemble LLC:

   a)      Zucker stripped M&O LLC of its trademark assets, committing them to Assemble
           LLC for Zucker's own personal use.

   b)      Zucker co-mingled money from the sale of products on the Assemble LLC

-34-

website for his own personal discretionary use, when the business purpose of Assemble LLC was to generate funds for his legal defense of the CPSC Administrative Action.

c)   Zucker exercised complete control over the assets and sales revenue from Assemble LLC for his own personal benefit in order to hinder, delay and/or defraud the claims of Meaghin, Jonathan and Braylon Jordan.

d)   Zucker continues to conduct the business of Assemble LLC, authorizing the sale of Assemble LLC products for Zucker's personal benefit.

e)   Zucker continues to conduct the business of Assemble LLC, authorizing Assemble LLC to sell M&O LLC products for Zucker's personal benefit.

f)   Zucker used the Assemble LLC corporate entity for his own personal benefit to conduct the fraudulent transfer of assets, as more particularly described in this Third Amended Complaint.

g)   Additional acts to support piercing the corporate veil of Assemble LLC will be proven at trial.

154.   The acts of Zucker were not in furtherance of the legitimate business of Assemble LLC. The stated purpose of Assemble LLC was to generate legal fees for Zucker's defense in the CPSC Administrative Action. The CPSC Administrative Action ended on May 14, 2014. However, Zucker continues to operate the Assemble LLC website and keep the money for his own personal discretionary use. Zucker's efforts were devised and/or executed as part of a plan, scheme, and/or conspiracy with the other Defendants to terminate existing claims and discourage future claims, allowing Zucker to keep all of the money generated through sales on the Assemble LLC website through the use and/or sale of M&O LLC assets. Evidence that the plan or conspiracy worked in favor of all Defendants is pled in greater detail in this Third Amended Complaint.

155.   As a direct and proximate result of the above acts of Zucker, the corporate veil of

Assemble LLC should be pierced to hold Zucker personally liable for all acts of Assemble LLC and claims against Assemble LLC pled in this Third Amended Complaint.

## COUNT SIX
## UNIFORM FRAUDULENT TRANSFER ACT

156.    Plaintiffs incorporate by reference all allegations contained in their Third Amended Complaint.

### The Fraudulent Transfer of Assets to Zucker and Bronstein

157.    On or April 2, 2012, it was determined that Braylon Jordan had incurred gastrointestinal injuries from swallowing Buckyballs.  Meaghin and Jonathan Jordan have incurred medical and other expenses in treating Braylon's injuries.  Plaintiffs have an unliquidated legal right to recover damages.  Meaghin Jordan, Jonathan Jordan, and Braylon Jordan each have a "claim" as defined by the Uniform Fraudulent Transfer Act ("UFTA"). Miss.Code Ann. § 15-3-101(c); 6 Del.C. § 1301(3).

158.    As persons with "claims," Meaghin, Jonathan, and Braylon Jordan are "creditors" as defined by the UFTA.  Miss.Code Ann. § 15-3-101(d); 6 Del.C. § 1301(4).

159.    As the manufacturer, designer, seller and/or distributor of Buckyballs,  M&O LLC is liable under applicable law for the "claims" of Plaintiffs.  M&O LLC is a "debtor" as defined by the UFTA. Miss.Code Ann. § 15-3-101(f); 6 Del. C. § 1301(6).

160.    Zucker was the CEO of M&O LLC.  Bronstein was an officer.  Zucker and Bronstein each owned a 50% interest in the company. Craig Zucker and Jake Bronstein are "insiders" of M&O LLC as defined by the UFTA. Miss.Code Ann. § 15-3-101(g); 6 Del.C. § 1301(7).

161.    On December 27, 2012, Zucker and Bronstein filed or caused to be filed a certificate of cancellation on behalf of M&O LLC, in part, for the unlawful purpose of avoiding Meaghin, Jonathan, and Braylon Jordan's claims.  Prior to the filing of the certificate of cancellation, Zucker and Bronstein raided and personally converted the assets of M&O LLC to their own use, leaving only approximately $350,000 for the creation of a liquidating trust to pay administratively filed claims ("The MOH Liquidating Trust").

162.    Upon information and belief, the MOH Liquidating Trust currently maintains assets valued at only $100,000.  At present and at the time of its creation, the funds in the MOH Liquidating Trust are/were grossly insufficient to pay the known claims of M&O LLC, including the claims of Meaghin, Jonathan and Braylon Jordan.

163.    M&O LLC has $0 in financial assets.  M&O LLC continues to maintain other assets in the form of active descriptive, fanciful and pictorial trademarks.  Upon information and belief, the discrete market value of such marks is minimal and is far less than the value of known claims against M&O LLC.

164.    On or around December 27, 2012, Zucker, Bronstein and M&O LLC authorized the transfer and/or completed the transfer of M&O LLC's remaining assets including, but not limited to, the payment of money to Zucker and Bronstein.  Such payment of money and/or disposition of assets was a "transfer" as defined by the UFTA.   Miss.Code Ann. § 15-3-101(l); 6 Del.C. § 1301(12).

165.    On December 27, 2012, M&O LLC became "insolvent" as defined by the UFTA. Miss.Code Ann. § 15-3-103; 6 Del.C. § 1302.

166.    Zucker, Bronstein, and M&O LLC made the above transfer with the actual intent

to hinder, delay, and/or defraud Meaghin, Jonathan, and Braylon Jordan by extinguishing available assets to pay their legitimate claims as creditors. This act by Zucker, Bronstein, and M&O LLC was with the consent and knowledge of, and consistent with a plan and scheme and/or in furtherance of a conspiracy with, The Insurance Defendants for the additional purpose of attempting to hinder, delay and/or defraud Meaghin, Jonathan, and Braylon Jordan from recovering available general liability and excess insurance coverage.

167.   The above transfers to Zucker and Bronstein were "fraudulent transfers" as defined by the UFTA. Miss.Code Ann. § 15-3-107; 6 Del.C. § 1304.

168.   Evidence of actual intent to hinder, delay and/or defraud Meaghin, Jonathan and Braylon Jordan includes, but is not limited to, the following:

a)   The transfer of M&O LLC's assets was to its insiders, Zucker and Bronstein.

b)   M&O LLC, Zucker, and Bronstein knew or had reason to know about the claims of Meaghin, Jonathan, and Braylon Jordan prior to the transfer.

c)   Before the fraudulent transfer was made, M&O LLC had been sued in both legal and administrative proceedings arising out of the manufacture, design, sale and distribution of Buckyballs, Buckycubes, and/or other rare earth magnet products.

d)   The transfer to Zucker and Bronstein consisted of substantially all money and remaining assets of M&O LLC, excluding only approximately $350,000.00 placed into The MOH Liquidating Trust for payment of administrative claims.

e)   Zucker, Bronstein and M&O LLC were obligated by law to make sufficient provision for the payment in full of the claims of Meaghin, Jonathan, and Braylon Jordan, and other similarly situated unliquidated creditors (e.g. the CPSC, injured children, etc.), but intentionally failed to do so, creating The MOH Liquidating Trust with only $350,000 in assets, of which only $100,000 remain.

f)   On the day after M&O LLC was dissolved, Zucker left the United States with his girlfriend for Thailand.

g)   M&O LLC became insolvent on December 27, 2012 upon completion of the

transfer of assets to Zucker and Bronstein.

h)      Based on pending administrative and legal actions, M&O LLC, Zucker, and Bronstein believed or reasonably should have believed that M&O LLC would incur debts beyond its ability to pay, in the form of civil penalties, administrative fines, and judgments.

i)      M&O LLC, Zucker, and Bronstein made the fraudulent transfers after the claims of Meaghin, Jonathan, and Braylon Jordan arose and were known by M&O LLC, Zucker, and Bronstein, causing M&O LLC to become insolvent as defined by the Uniform Fraudulent Transfer Act.

j)      Administrative claims against The MOH Liquidating trust will not be paid for a period of 10 years.

k)      M&O LLC's insurance carriers, both general and excess, including The Insurance Defendants, are refusing to defend M&O LLC and/or pay for covered claims against M&O LLC.

l)      Additional evidence of actual intent will be proven at trial.

169.    As a direct and proximate result of the fraudulent transfer of assets by Zucker, Bronstein and M&O LLC, Plaintiffs Meaghin, Jonathan, and Braylon Jordan seek all relief to which they would be entitled under the Uniform Fraudulent Transfer Act, including, but not limited to: an order setting aside such transfers to the extent necessary to satisfy Meaghin, Jonathan, and Braylon Jordan's claims; an order requiring Zucker to return all monies and/or assets to Plaintiffs fraudulently transferred in an amount sufficient to satisfy the claims of Meaghin, Jonathan, and Braylon Jordan; an injunction against Zucker freezing all assets in his possession from further disposition or transfer in an amount equal to the assets fraudulently transferred to him; and, an order attaching a lien on the assets of Zucker (whether held by him or in the hands of third parties) in an amount equal to the claims of Meaghin, Jonathan, and Braylon Jordan.  Plaintiffs claim such further legal and equitable relief to which they would be entitled

under the Uniform Fraudulent Transfer Act.

## The Fraudulent Transfer of Assets to Assemble LLC

170.    M&O LLC continues to maintain ownership of and control over multiple live

descriptive, fanciful, and pictorial trademarks registered with the United States Patent and

Trademark Office ("USPTO").  Live M&O LLC trademarks include the following:

| | | |
|---|---|---|
| a) | Buckyballs® | Reg. # 3733723; Serial # 77726439 |
| b) | Buckycubes® | Reg. # 4131860; Serial # 85407279 |
| c) | Chromatics® | Reg. # 4256520; Serial # 85518131 |
| d) | Bucky Bigs® | Reg. # 4257715; Serial # 85628317 |
| e) | B® (fanciful/pictorial) | Reg. # 3947821; Serial # 85113626 |
| f) | transparent cube on box (fanciful/pictorial) | Reg. # 4348657; Serial # 85123463 |

171.    M&O LLC continues to maintain ownership of and control over multiple live

descriptive, fanciful, and pictorial international trademarks registered with the World Intellectual

Property Organization ("WIPO").  Live international M&O LLC trademarks include the

following:

| | | |
|---|---|---|
| a) | Buckyballs® | Reg. #3733723; Serial #77726439 |
| b) | Buckyballs® | Reg. #TMA844760 (Canadian trademark) |
| c) | Buckyballs® | Serial # 009341322 (OHIM trademark) |
| d) | Buckyballs® | Reg. #5509430 (Japanese trademark) |
| e) | Buckyballs® | Reg. #1255178 (Mexican trademark) |

f)    Buckyballs®                              Serial #1330079
                                               (Australian trademark)

172.    Although a Certificate of Cancellation was filed on behalf of M&O LLC on

December 27, 2012, M&O LLC continued to do business through the registration and use of its

marks and the sale of its rare earth magnet products.

173.    M&O LLC's marks have been in use for more than two years and their

registration is incontestible.  M&O LLC invested substantial effort and financial resources in

developing and promoting its marks before such marks became devalued due to the prohibition

against the sale of it products.  However, through its efforts, M&O LLC's marks achieved a

significant level of market recognition.

174.    M&O LLC's representative of record authorized to receive notices from the

USPTO is The Watson IP Group PLC.

175.    On February 13, 2013, M&O LLC's USPTO representative received a USPTO

office action letter regarding M&O LLC's application for its fanciful/pictorial transparent cube

on box mark, Serial No. 85123463.  Doc. # 41-8.  In the USPTO office action letter, M&O LLC

was notified that its application for its fanciful/pictorial transparent cube on box mark had been

amended to include a ten-line description of the mark.  Doc. # 41-8, p. 2. M&O LLC was advised

to notify the USPTO of any objections. *Id.*

176.    M&O LLC did not contact the USPTO to indicate any objection or to suggest

that M&O LLC was no longer conducting business.

177.    On June 11, 2013, the USPTO issued a Certificate of Registration for

M&O LLC's fanciful/pictorial transparent cube on box mark, Reg. No. 4348657.  Doc. #41-9.

M&O LLC's Canadian trademark was registered on February 26, 2013, two months after M&O

LLC supposedly ceased doing business.

178.    In 2013, Zucker created a new company, Assemble LLC.  All profits from the sale

of products by Assemble LLC are for Zucker's personal benefit.  Doc. #41-6.

179.    M&O LLC trademarks are prominently displayed on the Assemble LLC website,

"UNITED WE BALL" unitedweball.org.  Doc. #41-7, pp. 1.  The word marks Buckyballs® and

Buckycubes® are prominently displayed.  The history of Buckyballs,  Buckycubes, and

M&O LLC is recounted.  Doc. #41-7, p. 1-3.

180.    One of the products sold by Assemble LLC is a transparent sealed cube containing

5mm neodymium magnet spheres that have the same shape and characteristics of M&O LLC's

Buckyballs®.  Doc. #41-10.  The transparent cube containing 5mm neodymium magnets is sold

under the name "Founding Balls".  *Id.*  The transparent cube product is identical in appearance to

M&O LLC's transparent cube on box mark, USPTO Reg. # 4348657.[5]

181.    Assemble LLC also sells 33 mm Liberty Balls in a group of 8 under the same

"Founding Balls" name.  Doc. #41-11.  The 33 mm Liberty Balls product is identical to

M&O LLC's Bucky Bigs®.  Doc. #41-12.

182.    On the first page of the "History" section of its website, Assemble LLC and

Zucker advertise their association with M&O LLC claiming: "Remember Buckyballs?  We do.

**We were part of the team from Maxfield and Oberton**, the company that created Buckyballs®

(and Buckycubes®)." (emphasis added). Doc. #41-7, p. 1.

183.    M&O LLC trademarks are prominently displayed on the Assemble LLC

_____

[5] Compare Doc. #41-10 to Doc. #41-1, and Doc. #41-9.

Facebook® page.  Doc. #41-14.   The word mark Buckyballs® is prominently displayed.  The M&O LLC transparent cube on box mark (Reg. # 4348657) is prominently displayed as part of an Assemble LLC "20% OFF" sales program.  Doc. #41-14, p.1, 2.

184.    On the Assemble LLC Facebook® page, a transparent sealed cube containing neodymium magnet spheres is prominently displayed under the heading: "The balls that launched one ridiculous lawsuit," a clear and unmistakable reference to Buckyballs.  Doc. #41-14, p. 3.

185.    M&O LLC trademarks are prominently displayed on the Assemble LLC "*United We Ball*" Twitter® feed.  Doc. #41-15.  The word mark Buckyballs® is prominently displayed.  The M&O LLC transparent cube on box mark (Reg. # 4348657) is prominently displayed as part of an Assemble LLC "20% OFF" sales program.  Doc. #41-15, p. 2, 3.

186.    Assemble LLC and Zucker advertised their association with M&O LLC, prominently displayed the M&O LLC marks and sold actual or strikingly similar M&O LLC products with the purpose and intent to confuse reasonable consumers.

187.    Any reasonable consumer looking at the Assemble LLC website, Facebook page, and/or Twitter feed as a whole would believe that M&O LLC authorized Assemble LLC to use live M&O LLC registered marks to sell Assemble LLC's products and/or to sell actual M&O LLC products.

188.    Any reasonable consumer looking at the Assemble LLC website, Facebook page, and/or Twitter feed as a whole would believe that Assemble LLC's "Founding Balls" products are actually M&O LLC products.

189.    Upon information and belief, Assemble LLC is selling M&O LLC products, including Buckyballs encased in transparent Lucite®, and Bucky Bigs.

190.     M&O LLC has the exclusive right to sell, license, or otherwise authorize the sale of its products.  This right of M&O LLC is an asset.

191.     M&O LLC has the exclusive right to sell, license, or otherwise authorize the use of its marks.  This right of M&O LLC is an asset.

192.     M&O LLC is not receiving payment for the sale of its products by Assemble LLC. M&O LLC is not receiving payment for the use of its marks by Assemble LLC.

193.     M&O LLC, Zucker and/or Bronstein authorized Assemble LLC to sell M&O LLC products and/or use M&O LLC's marks, using the proceeds for Zucker's personal benefit, constituting a "fraudulent transfer" of M&O LLC's assets as defined by the UFTA.

194.     Such fraudulent transfer was with actual intent to hinder, delay and/or defraud Meaghin, Jonathan, and Braylon Jordan.  Evidence of actual intent to defraud includes, but is not limited to, the following:

a)     Money generated from sales on the Assemble LLC website as a result of Assemble LLC's use of M&O LLC's marks, is being paid to Zucker or to other third parties on his behalf.

b)     M&O LLC is not getting paid any money for use of its marks by Assemble LLC.

c)     Money from the sale of M&O LLC products on the Assemble LLC website is being paid to Zucker or to other third parties on his behalf.

d)     M&O LLC is not getting paid any money for the sale of its products by Assemble LLC.

e)     M&O LLC continues to maintain the exclusive control and right to use its marks and sell its products.

f)     Before the transfer of the rights to sell M&O LLC products and use M&O LLC marks was made, M&O LLC had been sued in both administrative and judicial proceedings and/or was threatened with suits involving its rare earth magnet products, including, but not limited to, Buckyballs.

g)      M&O LLC is insolvent.

h)      Although the Assemble LLC website indicates that money raised is to pay legal fees for Zucker and M&O LLC, upon information and belief, there has been no active litigation for years and Zucker has been using the money for his personal benefit.

i)      Additional evidence of actual intent will be offered at trial.

195.    As a direct and proximate result of the above fraudulent transfer of assets by M&O LLC, Assemble LLC, Zucker and/or Bronstein, Plaintiffs Meaghin, Jonathan, and Braylon Jordan seek all relief to which they would be entitled under the Uniform Fraudulent Transfer Act, including, but not limited to: an injunction ordering Assemble LLC to cease and desist using M&O LLC marks to generate funds for the personal use of Zucker; an injunction ordering Assemble LLC to cease and desist selling M&O LLC products; an order requiring Assemble LLC to return all monies generated by the sale of M&O LLC products or the use of M&O LLC marks in an amount sufficient to satisfy the claims of Meaghin, Jonathan, and Braylon Jordan; an order requiring Zucker to return all monies he received from Assemble LLC or that were otherwise used by Assemble LLC for his personal benefit in an amount sufficient to satisfy the claims of Meaghin, Jonathan, and Braylon Jordan; and, an order attaching a lien on all monies (whether held by Zucker or in the hands of third parties) received by Zucker from Assemble LLC or that were otherwise paid by Assemble LLC for Zucker's personal benefit.  Plaintiffs claim such further legal and equitable relief to which they would be entitled under the Uniform Fraudulent Transfer Act.

**COUNT SEVEN**
**FEDERAL CIVIL RICO**

196.    Plaintiffs incorporate by reference all allegations contained in their Third

Amended Complaint.  Allegations in this Count apply equally to claims asserted by Plaintiffs under the Federal Racketeer Influenced and Corrupt Organizations Act (Federal Civil RICO)[6] and claims for civil conspiracy pled in Count Eight.

### The RICO Defendants

197.    The RICO Defendants are those Defendants identified in Plaintiffs' Third Amended Complaint.  Upon information and belief, there are additional RICO Defendants, unknown at this time, who are identified in the group Defendants Does 5 - 15.  The names of the additional RICO Defendants will be added to this Third Amended Complaint when they become known.

198.    The RICO Enterprise is an association in fact between The RICO Defendants as more fully described in Plaintiffs' Third Amended Complaint.   Each of the RICO Defendants have an existence separate and distinct from The RICO Enterprise.

199.    In the following paragraphs, Plaintiffs will use the term "The RICO Enterprise" to include The RICO Enterprise under federal law and the civil conspiracy enterprise under Mississippi law.

### Standing to Sue under Federal Civil RICO

200.    Plaintiffs Meaghin, Jonathan, and Braylon Jordan have standing to sue under Federal Civil RICO.

201.    Meaghin and Jonathan Jordan have been injured in their property as a result of the pattern of racketeering activity by The RICO Enterprise.  Meaghin and Jonathan Jordan have been caused to liquidate their assets and/or incur monetary expenses to pay attorney's fees and

---

[6] 18 U.S.C. § 1961, et. seq.

other related expenses individually and on behalf of Braylon Jordan, including but not limited to, legal fees and costs to reinstate M&O LLC as an existing suable entity.  Such legal fees and costs include all fees and costs to pursue an action in the Delaware Court of Chancery to reinstate M&O LLC's Certificate of Operation ("The Delaware Lawsuit").  Such legal fees and costs are specific in an amount and will be proven at trial.

### The RICO Plan, Scheme, and/or Civil Conspiracy

202.    The RICO Defendants acted individually, in concert, and/or as co-conspirators, as part of plan or scheme:

a)      That enabled Zucker and Bronstein to strip M&O LLC of its assets and convert those same assets to Zucker and Bronstein's personal use.

b)      That enabled M&O LLC to avoid or minimize civil administrative fines, penalties and civil legal judgments.

c)      That enabled Assemble LLC and Zucker to use M&O LLC assets for their own personal use.

d)      That enabled Assemble LLC and Zucker to sell M&O LLC assets for their own personal use.

e)      That enabled The Insurance Defendants to avoid coverage (cost of defense and indemnity) for the covered acts of M&O LLC, Zucker and/or Bronstein.

f)      That enabled The Insurance Defendants, or some of them, to recover covered costs and expenses from the assets of M&O LLC.

g)      Additional elements of the RICO plan, scheme, or conspiracy will be proven at trial.

203.    Funds or income from the pattern of racketeering activity and/or conspiracy were used to operate The RICO Enterprise, as follows:

a)      Paid to Zucker and Bronstein for their own personal use.

b)      To pay Zucker's legal fees.

c)      To pay M&O LLC's legal fees.

d)      To invest in, establish, maintain, and/or operate Assemble LLC and its internet sales program.

e)      Upon information and belief, to reimburse The Insurance Defendants, or some of them, for covered costs and expenses of litigation.

f)      Additional use of funds and/or income from the pattern of racketeering activity by The RICO Enterprise will be proven at trial.

204.    M&O LLC and Zucker acquired an interest in the operations of Assemble LLC. Assemble LLC products and/or M&O LLC products were and are being sold to pay their legal fees, and/or for Zucker's own personal benefit.  Such products are being sold as a result of the pattern of racketeering activity by The RICO Enterprise, including, but not limited to, the unlawful transfer, use and/or sale of M&O LLC assets by Assemble LLC.

205.    The RICO Defendants conspired with each other to accomplish the racketeering activity of The RICO Enterprise.

### Pattern of Racketeering Activity

### i. Predicate Acts

206.    Plaintiffs incorporate by reference all acts pled in their Third Amended Complaint as predicate acts under Federal Civil RICO.

207.    The predicate acts of The RICO Enterprise were devised and/or executed by The RICO Defendants, in part, by placing and/or depositing for delivery by the United States Postal Service and/or other private or commercial interstate carriers, in interstate or foreign commerce, parcels, letters, documents, or other such matters in violation of 18 U.S.C. § 1341, relating to

mail fraud.

208.    In combination with fraud by mail, or in the alternative to fraud by mail, the predicate acts of The RICO Enterprise were devised and/or executed by The RICO Defendants, in part, by transmitting or causing to be transmitted by means of wire, radio, internet or television communication in interstate or foreign commerce, writings, signs, signals, pictures, or sounds in violation of 18 U.S.C. § 1343, relating to wire fraud.

209.     The predicate acts of The RICO Enterprise, all or part of which were conducted in interstate or foreign commerce, include, but are not limited to:

a)    M&O LLC assets were fraudulently transferred, by mail and/or by wire, to its insiders, Zucker and Bronstein, in violation of the UFTA.

b)    The fraudulent transfer of M&O LLC assets to Zucker and Bronstein was of substantially all of the remaining assets of M&O LLC.

c)    M&O LLC, Zucker, and/or Bronstein grossly under funded The MOH Liquidating Trust, by mail and/or by wire, at an amount of only $350,000.00 when they knew there were outstanding claims against M&O LLC far greater than that amount.

d)    M&O LLC, Zucker and/or Bronstein filed, or caused to be filed, by mail and/or by wire, a certificate of cancellation of M&O LLC, after grossly under funding the MOH Liquidating Trust for the purpose of avoiding or minimizing administrative fines and penalties and/or ongoing and future civil litigation.

e)    Zucker and Bronstein caused M&O LLC to become insolvent.

f)    Assemble LLC and Zucker used M&O LLC assets (M&O LLC registered marks) to sell Assemble LLC products for Assemble LLC's benefit.

g)    Assemble LLC and Zucker used M&O LLC assets (M&O LLC registered marks) to sell Assemble LLC products for Zucker's benefit.

h)    Assemble LLC and Zucker used M&O LLC assets (M&O LLC registered marks) to sell Assemble LLC products for M&O LLC's benefit.

i)    The images of M&O LLC's registered trademarks were transmitted and/or caused

-49-

to be transmitted by Assemble LLC and Zucker on Assemble LLC's internet website, "*UNITED WE BALL*."  Doc. #41-7.

j) Assemble LLC and Zucker sold M&O LLC products for Assemble LLC's benefit.

k) Assemble LLC and Zucker sold M&O LLC products for Zucker's benefit.

l) Assemble LLC and Zucker sold M&O LLC products for M&O LLC's benefit.

m) Money from the sale of Assemble LLC products on its "*UNITED WE BALL*" website was obtained through use of wire/electronic fund transfers from customers' VISA®, Mastercard®, American Express®, Discover®, Bitcoin®, or other such accounts.  Doc. #41-13.

n) Money from the sale of M&O LLC products on the Assemble LLC "*UNITED WE BALL*" website was obtained through use of wire/electronic fund transfers from customers' VISA, Mastercard, American Express, Maestro, or other such accounts.  Doc. #41-13.

o) Assemble LLC products, sold on its "*UNITED WE BALL*" website, were shipped to customers by United Parcel Service ("UPS") ground, a private or commercial interstate carrier.  Doc. #41-13.

p) M&O LLC products, sold on Assemble LLC's "*UNITED WE BALL*" website, were shipped to customers by UPS ground, a private or commercial interstate carrier.  Doc. #41-13.

q) On December 10, 2012, Alterra caused to be filed a pleading, by mail or electronic means, in a case pending in the State Court of California, County of San Francisco [*Alterra Specialty Insurance v. Maxfield and Oberton Holdings, LLC,* No. CGC-12-522867], claiming that Alterra did not owe a duty to defend or a duty of indemnity to M&O LLC, and requesting that M&O LLC reimburse Alterra for litigation fees and costs incurred.

r) On December 10, 2012, **the same day as Alterra's pleading**, M&O LLC, Zucker and/or Bronstein caused to be filed a pleading in the California Case withdrawing M&O LLC's defenses, admitting no coverage under the subject Alterra policy, and **agreeing to reimburse Alterra's litigation expenses out of M&O LLC assets.**

s) Upon information and belief, Alterra was paid money by M&O LLC or money was paid by M&O LLC on Alterra's behalf, by mail and/or by wire, to reimburse Alterra's litigation expenses in the California Case.

t)   On December 27, 2012, M&O LLC, Zucker and/or Bronstein filed, or caused to be filed, M&O LLC's Certificate of Cancellation with the Secretary of State of Delaware.

u)   On December 27, 2012, **the same date as the above filing**, M&O LLC, Zucker and/or Bronstein served or caused to be served a Notice of Withdrawal of Counsel in the CPSC Administrative Action on the basis that "Maxfield and Oberton no longer exists."

v)   On the day after the filing of M&O LLC's Certificate of Cancellation, or shortly thereafter, Zucker fled the country and the jurisdiction of the United States for Thailand.

w)   In subsequent civil actions filed against M&O LLC and/or Zucker, Zucker has evaded the civil process of the Federal Courts.

x)   Great American has taken the same above  "no insurance coverage" position regarding the claims of Meaghin, Jonathan and Braylon Jordan against M&O LLC.

y)   Upon information and belief, Great American has taken the same above "no insurance coverage" position in connection with claims asserted by other third parties against M&O LLC.

z)   Upon information and belief, Indian Harbor has taken the same above "no insurance coverage" position in connection with claims asserted by other third parties against M&O LLC.

aa)  Upon information and belief, Alterra has taken the same above "no insurance coverage" position in connection with claims asserted by other third parties against M&O LLC.

bb)  Assemble LLC and Zucker fraudulently advertise on The Assemble LLC website that sales proceeds are being used to defend Zucker in the CPSC Administrative Action that was dismissed on May 14, 2014.

cc)  The images of M&O LLC's registered trademarks were transmitted and/or caused to be transmitted by Assemble LLC and Zucker on Assemble LLC's Facebook page.  Doc. #41-14.

dd)  The images of M&O LLC's registered trademarks were transmitted and/or caused to be transmitted by Assemble LLC and Zucker on Assemble LLC's Twitter feed. Doc. #41-15.

ee)     Additional predicate acts will be proven at trial.

**ii. Continuous Pattern of Racketeering Activity and Conspiracy**

210.    Evidence of a continuous pattern of racketeering activity and conspiracy includes,

but is not limited to the following:

a)     M&O LLC, Zucker, Bronstein and/or The Insurance Defendants continue to hinder, delay and/or defraud third party civil litigation claims on the basis that M&O LLC was dissolved, leaving the grossly underfunded MOH Liquidating Trust and no insurance coverage.

b)     Great American has taken a "no coverage" position in this case regarding the claims of Meaghin, Jonathan and Braylon Jordan.

c)     Great American, Alterra, and/or Indian Harbor have taken the position of "no coverage" in the claims of Sabrina Lopez, Finn Thompson and other individuals who will be identified at trial.

d)     The Assemble LLC website is active and its products continue to be sold using M&O LLC assets, i.e. live registered trademarks.

e)     The Assemble LLC website is active and M&O LLC products continue to be sold.

f)     Although the Assemble LLC website indicates that money raised is to pay legal fees for Zucker, the Assemble LLC website is active and its products continue to be sold with Zucker using the money for his personal benefit.

g)     The Assemble LLC Facebook page is active and continues to advertise products which are being sold for Zucker's personal benefit.

h)     The Assemble LLC Twitter feed is active and continues to advertise products which are being sold for Zucker's personal benefit.

i)     Additional acts evidencing a pattern of continuous racketeering activity will be proven at trial.

**COUNT EIGHT**
**CIVIL CONSPIRACY**

211.    Plaintiffs incorporate by reference all allegations contained in their Third

Amended Complaint.

212.    All Defendants joined in a civil conspiracy, as defined by Mississippi law, for the

unlawful purposes described in greater detail in other paragraphs of Plaintiffs' Third Amended

Complaint.

213.    Evidence of a civil conspiracy between the Defendants is proven by their

declarations and conduct, as described in greater detail in Plaintiffs' Third Amended Complaint.

**COUNT NINE**
**PUNITIVE DAMAGES**

214.    Plaintiffs incorporate by reference all allegations contained in their Third

Amended Complaint.

215.    The actions of all Defendants were intentional, willful, and/or conducted with

such gross negligence, so as to entitle Plaintiffs to recover punitive damages from each

Defendant.

**V.**
**DAMAGES**

216.    Plaintiffs incorporate by reference all allegations contained in their Third

Amended Complaint.

217.     As a direct and proximate result of the actions and/or inactions by all Defendants,

Meaghin and Jonathan Jordan have been caused to liquidate assets, spend money, incur legal

fees, and/or otherwise take on the responsibility of paying Braylon Jordan's medical and other

expenses associated with his injuries described herein.  Plaintiffs Meaghin and Jonathan Jordan

are entitled to a judgment against Defendants, jointly and severally, for all medical expenses

and/or other expenses paid by them, or contractually paid by other third parties, for injuries

-53-

incurred by Braylon Jordan.  Plaintiffs Meaghin and Jonathan Jordan are entitled to a judgment against Defendants, jointly and severally, for all legal fees and costs incurred by them to collect their claims identified herein.  Additional damages will be proven at trial.

218.    As a direct and proximate result of the actions and/or inactions by all Defendants, Braylon Jordan sustained severe, permanent and irreversible personal injury and disability. Braylon Jordan has incurred medical expenses, and will continue to incur medical expenses in the future in order to treat and rehabilitate his condition.  Braylon Jordan suffers from permanent disfigurement and has incurred, and will continue to incur, extreme emotional distress and anxiety.  Braylon Jordan has suffered loss of enjoyment of life and a loss of wage earning capacity.  Additional damages will be proven at the trial.

219.    As a direct and proximate result of Plaintiffs' Federal Civil RICO injuries Plaintiffs demand an award of damages and judgment against all Defendants, jointly and severally, for three times the amount of their legal fees and expenses incurred for prosecuting The Delaware Lawsuit, including attorneys' fees and all costs of this suit.

220.    Plaintiffs demand an award of damages and judgment against Defendants, jointly and severally, under other applicable law for punitive damages, prejudgment interest, post-judgment interest, attorneys' fees, and costs of this action.

221.    Plaintiffs claim additional damages to be proven at trial.

## VI.
## CONSTITUTIONAL CHALLENGE
## TO NON-ECONOMIC DAMAGES CAP

222.    Plaintiffs incorporate by reference all allegations contained in their Third Amended Complaint.

223.    Should Defendants seek application of the Mississippi non-economic damages cap, Miss. Code Ann. § 11-1-60(2)(b), Plaintiffs contend that the Mississippi non-economic damages cap is unconstitutional, in violation of the United States Constitution's Equal Protection Clause, and is otherwise unconstitutional for additional reasons to be argued to the Court post-verdict.  Plaintiffs contend that the Mississippi non-economic damages cap is unconstitutional, in violation of the Mississippi Constitution's Jury Trial Clause, Separation of Powers Clauses, Due Process Clause, Remedy Clause, and is otherwise unconstitutional for additional reasons to be argued to the Court post-verdict.

224.    Plaintiffs demand judgment against all Defendants for all actual damages to which they are entitled, without application of the Mississippi non-economic damages cap set forth in Miss.Code Ann. § 11-1-60(2)(b).

WHEREFORE, PREMISES CONSIDERED, Plaintiffs, Meaghin Jordan, Jonathan Jordan, and Braylon Jordan, demand a joint and several judgment against Defendants Maxfield & Oberton Holdings, LLC; Craig Zucker; Assemble LLC; Great American E&S Insurance Company; Alterra Excess and Surplus Insurance Company f/k/a Max Specialty Insurance Company; Evanston Insurance Company; Markel Insurance Company, Inc.; Scottsdale Insurance Company; Indian Harbor Insurance Company, and Does 5-15 in an amount sufficient to compensate them for all actual damages to which they are entitled by law, punitive damages, injunctive relief, attorneys' fees, prejudgment interest, post-judgment interest, and all costs of this action.

DATED this the 20th day of October, 2016.

Respectfully submitted,

MEAGHIN, JONATHAN AND BRAYLON JORDAN

BY:    /s/ C. Victor Welsh, III
           C. VICTOR WELSH, III

## CERTIFICATE OF SERVICE

I, C. Victor Welsh, III, certify that a true and correct copy of the above Third Amended

Complaint has been served on all counsel of record through this Court's electronic filing system,

and served on following counsel by United States mail:

Richard E. King
RKing@gallowayjohnson.com
GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, A PLC
One Shell Square
701 Poydras Street, 40th Floor
New Orleans, LA 70139

Counsel for Assemble, LLC

This the 20th day of October, 2016.

/s/ C. Victor Welsh, III
C. VICTOR WELSH, III

OF COUNSEL:

C. VICTOR WELSH, III, MSB# 7107
Email: cvw@pgrwlaw.com
CRYMES M. PITTMAN, MSB# 99225
Email: cmp@pgrwlaw.com
PITTMAN, GERMANY, ROBERTS & WELSH, LLP
410 South President Street (39201)
Post Office Box 22985
Jackson, Mississippi 39225-2985
Telephone: (601) 948-6200
Facsimile: (601) 948-6187

-56-